## EPLEY v. STATE.

No. A-11387. Sept. 12, 1951.

(235 P. 2d 711.)

Jess L. Pullen, Oklahoma City, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Sam H. Lattimore, Asst. Atty. Gen., for defendant in error.

POWELL, J. O. D. Epley was tried in the district court of Oklahoma county for the crime of rape in the first degree, convicted and punishment assessed by the jury at 40 years imprisonment in the State Penitentiary. It was charged in the information that the act was accomplished by means of force and threats of immediate injury and great bodily harm, accomplished by apparent power of execution, and preventing resistance. 21 O. S. 1941 §§ 1111 subd. 5, 1114. Motion for new trial was filed September 24, 1949, in due time, and overruled, and on February 2, 1950, there was filed a supplemental motion for new trial grounded on the contention that the prosecutrix had committed

perjury at trial. There were three affidavits attached to the motion, and Kenneth John Cody, a witness for the state at trial, testified in support of the motion, which was by the court overruled. The case is here on appeal. Plaintiff in error will be referred to as defendant, as in lower court.

Oral argument was first heard on February 28, 1951. Counsel for defendant had filed an exhaustive brief on May 15, 1950, which on study was quite convincing, especially so in the absence of a brief on the part of the state, so that when the case came on for hearing the defendant's argument was by this court cut short. The state on the day of argument filed a very short brief that did not treat all the issues raised by counsel for defendant. After argument the case was submitted and assigned for opinion, and the subsequent study of the record failed to disclose evidence that would support the strong conclusions and argument of counsel for defendant. Feeling that by reason of the court having cut short counsel's oral argument on account of the force of his brief, the case was set for further oral argument, which was made on June 21, 1951.

Counsel for defendant, both in brief and orally, had argued that the evidence supported the theory that the prosecuting witness had not resisted the defendant's advances, but had willingly entered into the sexual relations with him, had not resisted, but even assisted him in the accomplishment of the act.

Specifically, in brief filed herein, it is stated: "And then she [prosecutrix] testified about taking her clothes off and she testified frankly and candidly that she, with her own hand, inserted the private organ of the defendant in her private organ, and claimed further that she did this at the request of the defendant." Additionally it is stated: "In this connection, we point out to this court that there is not one word of testimony from the lips of the prosecution or any other witness that she resisted in the slightest."

The above and other positive statements challenged by the Attorney General, particularly at last oral argument, has caused all members of this court to examine and re-examine the record most painstakingly. This court has over the years in this kind of a case, not overlooked, but has recognized that "it must be remembered that this [rape] is an accusation easily to be made and hard to be proved and harder to be defended by the party accused, though never [ever] so innocent". Morris v. State, 9 Okla. Cr. 241, 131 P. 731, 736. Therefore, herein counsel for the defendant was given opportunity to point out specific evidence in support of the important contention heretofore stated. This he was unable to do. The statements seem merely to represent counsel's thoughts from his study of the case as a whole. A detailed consideration of the evidence seems required. The printed details of this kind of a crime is to be deplored, but such a crime strikes at the very foundations of a civilized order. Does the evidence support the conviction? Duty impels the analysis.

Georgia Rae Cather, the prosecuting witness, testified that she became 18 years of age on March 11, 1949; that she was 5' 3" in height and weighed 103 pounds; that there were six other children in the family, and that she was next to the oldest; that she graduated from the Pawnee High School in 1948; that her father was a laborer and she, after graduation, had to make her own living; that she had worked in a cafe part time while going to school; that she had always lived in Pawnee except when she was a small child her parents had lived in California for a short time. She came to Oklahoma City to live with an uncle and aunt, both employed by a local telephone company, where she hoped to obtain employment as a telephone operator. Her uncle's son was away at college. They lived on Northwest 37th street, Oklahoma City. She would catch the bus at 39th and May avenue. But the way she had to go, it was about six blocks to her home.

On June 21, 1949, she went to work at the Katz Drug Store, Oklahoma City. Her hours were from 3:30 p. m. until midnight. When she got off from work this first day of her employment, she and a girl friend walked one block south to Grand avenue and went to the Wellman Cafe to drink coffee. They sat at the counter, and Miss Cather noticed three men in a booth. They had on navy blue uniforms, with shoulder patches, and she took them for policemen. One of them motioned to her to come to the booth, but she would not do so. The men left the cafe and about five minutes thereafter the girls left and one of the men whom she then recognized as a boy who had caught a city bus on 39th street in front of the Log Cabin Theatre where she would also catch the bus, and with whom she was casually acquainted, hollered: "Bashful", and proceeded to introduce her to his two companions. Witness and her friend Amy then went around the corner to the bus stop and Amy left her. About that time a dark, two-door car drove up. O. D. Epley, the defendant, was driving, and he asked her if she wanted to ride home. He told her that the busses had quit running as it was after 12:30, but she told him that Amy had said that the busses did run and that she would just wait. But she stated that the boy she knew as Kenneth also said that the bus had quit running, so she said that seeing Kenneth, and knowing that he lived in just a few blocks of her, and believing the men to be policemen, she decided to permit them to drive her home. She sat in the front seat between Epley and Kenneth John Cody, and Collins sat in the back seat. The defendant thereafter drove around the block and the men said something about picking up some more girls, but gave this up and proceeded to drive northwest in the direction of the home of witness, about the way of her bus route. The first stop was on Northwest 39th street at the Log Cabin Theatre, located several blocks east of May avenue, where Kenneth John Cody got out, and which was the nearest point to her home, but she did not get out, apparently anticipating that she would be driven to her home. George Collins, the other patrolman, got in the front seat with witness and defendant, and then defendant drove a few blocks on west and stopped at the Double Eagle Cafe located at 2818 Northwest 39th to let George out, and thereafter in the place of driving to Georgia's home at 2462 Northwest 37th street Place, the defendant turned right into May avenue and drove north, saying to witness: "You know you want to go for a drive, don't you? Witness stated that all the time she was protesting that she wanted to go home.

Prosecutrix stated that defendant was saying to her that he was not married, and could prove it by going out to Tinker Field Air Base; that she told him it would make no difference whether he was married or not; that he was telling her about the many places that he had been to in California, etc. But he made no advances at the time and that neither he nor the other two boys had theretofore made any advances and that she had not entered into the conversation that went on between them. She stated that when defendant got to the Wiley Post Air Field on North May avenue he turned off on a dirt road, drove about a quarter of a mile and turned around and stopped the car. He then reached over and pulled her over to him; and tried to kiss her, but she would not let him. She further stated:

"Then he said he liked his girls that way, when they wouldn't give in. He told me I wasn't the first girl anyhow. Then later he started getting mean about it and he told me to get in the back seat and I wouldn't do it. I had dropped one of my combs—I got outside—and after I got out I tried to get away from him and he pushed me in the back seat and told me I might as well get in anyhow. Q. Was any weapon mentioned prior to this time? A. He told me he had a gun. I was crying and screaming all the time— Q. Go ahead. A. He told me that he would use it if I didn't be quiet and stop crying. * * * From where we were sitting we could see the lights, from the houses, I guess, and he told me to stop screaming. After he got me down in the back seat he took a

handkerchief out of his pocket and he laid it up on the front seat and I threw it out, but he got it. I thought he was going to choke me with it, so I told him I wouldn't cry or scream any more. * * * Q. What did he do with the handkerchief? A. He just threw it up on top of the front seat—we were in the back seat —and I threw it down. I was afraid he might use it. He picked it up and put it back there. * * * Q. What happened next? A. He took my clothes off, then he took his off."

She stated that he was about to rip off her blouse and that she took it off to keep him from ripping it. That defendant took her slip from her shoulders and left it around her waist, took off her bra and took off her panties, and that she was crying all the while; that he then took off his clothes and started kissing her and playing with her breasts, and that he took her hand and placed it on his privates and made her play with his private parts. She stated: "I did not want to, but he kept my hands down there anyhow." Witness further testified that defendant then put his private parts into hers; that she told him that he was hurting her and to leave her alone, but that he would not quit; that it seemed like an hour or so that defendant was on top of her; that he held her with one hand and fondled her with the other; that when he finished the act he let her up and she put her clothes back on and he put his clothes on. She was asked:

"Q. Was there any conversation at that time between you and the defendant? A. I don't exactly remember, but the handkerchief was still up there and he kept—I thought he was going to choke me with it. Q. Did he ever use the handkerchief for anything? A. Later he wiped his private parts off with it and then gave it to me."

She stated that she used it. Further, that while defendant was on top of her that he was hurting her all over, her neck and head were cramped against one side of the car and her feet were up in the window and that she kicked off her shoes because they were hurting her the way her feet were cramped. She stated that defendant kept asking her if she was going to tell and she kept telling him "no", because she was scared. He then asked her if she would go with him the next night, and she said "yes", because she wanted to go home and that she felt that he would not let her go if she told him she was going to tell on him. Defendant then took witness directly to her home. It was 2:45 a.m. That on getting out of his car she ran in the house and went to her room and got on her bed and cried and then went to the bathroom, and then went to her aunt's room. She was asked:

"What did you do in the bathroom, Georgia? A. Well, I was bleeding all the time. It wasn't my regular menstruation period either. I just kept bleeding all the time. It wouldn't stop. Then I kept bleeding for about two days. Q. What did your aunt do after she got up, if anything? A. She gave me a douche and asked my uncle to call the police."

She stated that the police arrived in 15 or 20 minutes; that they took her clothes and took her to the Mercy Hospital; that the doctor checked her over and stopped the bleeding and she was taken back home. She was questioned as to any further medical treatment and stated: "A. Yes, I went back a day later, because I was still bleeding. My blood was clotting on me. He had his nurse call down to the place where I was working and she told them that I would have to stay in bed, because I had lost so much blood that I couldn't hardly walk." The court ordered what witness told the nurse stricken.

On cross-examination witness stuck with her testimony given on direct examination. She testified that she had never had intercourse before; she did say that she had a few dates with high school students while in school at Pawnee, but had never gone on trips with students. She admitted that she

never saw defendant with a gun though he threatened to use one on her if she did not stop crying and screaming; and she admitted having no. bruises on her body. She stated that at the time of the trial she was living in Enid and working at Woolworth's.

Mrs. George W. Evans testified that she was Georgia Rae Cather's aunt by marriage; that at about 15 minutes to 3 of the morning in question she heard what sounded like a strange car in the neighborhood, that she lived on a dead-end street, that it was leaving a point near her house, that she heard someone get out of the car, run up the steps and enter the house; that she heard Georgia go to her bedroom and then to the bathroom, and then she came to the room of witness; that Georgia was crying and that her clothing was wrinkled; that she told her about her experience and that witness went to the bathroom with her and that there was blood in the stool; that she gave the girl a douche and had some difficulty doing it as she complained of it hurting; that they called the police and took the girl to the Mercy Hospital where she was examined by a physician and treated; that she cried all the way to the hospital. Witness testified that she, her husband and the girl at the suggestion of the officer, drove out and tried to find where she had been parked with the defendant, but could not find the place.

George W. Evans testified substantially as his wife. He further stated that Georgia came down to the Katz Drug Store the next day at about 3:30 p.m., but in the meantime the police called and wanted her at a "show-up" and that he went down and got her and took her to the police "show-up" where she identified defendant, who appeared with a number of other uniformed Tinker Field guards.

W. W. Harrison, radio patrolman, testified that at 3:20 a.m., June 22, 1949, he received a radiogram to go to 2462 Northwest 37th Place. He stated: "A. We were met at the front door by Mr. George W. Evans. He asked us to come in the house, which we did. When we walked into the front room we could hear quite a commotion, which we thought was in the bathroom, as well as we could understand. In a moment a hysterical girl came into the front room." He stated that the girl described her attacker and the two boys that had been with him; that witness took charge of the clothing supposed to have been worn by the girl at the time of the attack; that the bundle was picked up by the detectives later on that day; that he and Mr. Evans took the girl to Mercy Hospital where she was examined by Dr. Berkinbile.

Hilton Geer, detective, testified as to locating the Tinker Field Guards and having them in a "show-up" where O. D. Epley was quickly identified by the prosecutrix. She identified Epley and the two men claimed to have been his companions from a number of other guards in the line-up. Witness further stated:

"* * * The following day we went out to Mr. Evans' home and picked up her uncle and Miss Cather, and took them in the car in an attempt to find out where this alleged attack had happened. We drove them to the Wiley Post airport, which she thought was close by, and a short ways north of the airport we found the exact spot. She had described the spot as being close to a lake about two or three blocks away from a house. Q. Was there any house in that vicinity closer than two or three blocks? A. No, it was a hundred yards or better to the nearest house. Q. Did you make an examination there at the area? A. Yes, sir. Q. Did you find anything? A. Yes, we found a handkerchief, which was described by Georgia as being thrown out of the car. Q. Was there anything about the handkerchief that furnished any identification? A. It was all bloody and messed up."

He stated that he took the handkerchief and got the clothing from Mrs. Evans' home. The officer further identified the clothing that Mrs. Evans

identified as having been removed from the body of Georgia the morning of June 22, the slip having blood on the bottom, the pants being bloody, and the skirt had a spot on it. The handkerchief and clothing were admitted in evidence after proper identification.

Of course, the statement of the witness that the prosecutrix identified defendant in the police line-up as the person who attacked her was hearsay, and the admission constituted error, but the statement was not objected to, and the error was harmless inasmuch as the defendant testified and admitted that he was the driver of the car conveying the prosecutrix on the morning of June 22, 1949, and that he did have intercourse with her. Likewise the statement that witness identified Cody and Collins as the other two guards was hearsay, but they, too, testified to such being true.

Dr. Glen L. Berkenbile testified that on the morning of June 22, 1949, he was resident physician at Mercy Hospital, Oklahoma City; he qualified as an expert witness and stated that he spent 15 to 20 minutes that morning examining Georgia Rae Cather. He said:

"On the examination of Miss Cather, I noticed that across her buttocks there was a thin film of dried blood, which apparently someone had tried to clean off. Upon separating the vulva, I could see that previously, recently previously had been received a laceration to her hymen, which I believe had been intact before then. There was a laceration, or tear, on each side of the vagina. On the right side it was torn into the mucoser lining of the vaginal wall."

He further testified:

"I know that I saw her again about two or three days later, at which time I had to clamp and tie off two small arteries. They were still bleeding. I did not see her after that. Q. Doctor, what is your professional opinion with reference to whether prior to that recent act of intercourse she was a virgin? A. I believe she was."

On cross-examination witness stated that he noticed no bruises on the body, legs or arms of the girl.

George B. Collins, witness for the state, testified that he was acquainted with defendant, that each had been employed at Tinker Field as guards and wore uniforms similar to policemen except they had shoulder patches; that they also wore pistol holsters, but had no guns except when on duty; that on the early morning of June 22, 1949, he was in a booth at Wellman's Cafe on Grand avenue with defendant and another Tinker Field guard by the name of Cody, that he observed the prosecuting witness and another girl at the counter drinking coffee; Epley, Cody and witness left first. When the girls came out, he said: "We spoke to them. Epley said, 'let's take them home.' We were all talking to them and they said that she lived too far out on the northwest side of town. He told them that we were going that way. The girl walked on around to the bus stop. We couldn't see where she went to after she passed the corner. We drove around there and she was standing there at the bus stop." Witness further testified that Epley drove down Fourth to Classen and out Classen to 39th, and out 39th to the Log Cabin Theatre where they let Cody out, and Epley offered to take witness home, but he asked him to just let him out at the Double Eagle Cafe just west on 39th, to get a cup of coffee; that the girl expressed a desire to be taken home, stating where she lived on 37th Street Place. He testified that the girl, to the best of his knowledge, kept her hands folded in her lap during the drive and that he did not see her whisper with the defendant or do or say anything out of the way.

James Horrigan testified that he was county evidence officer in Oklahoma county and he testified to the method of keeping and preserving the state's exhibits that had been admitted in evidence, testifying as to the condition being the same as when delivered to him the date of the charge in question, etc.

Kenneth John Cody testified that he was 25 years of age, lived at 2400 Northwest 39th street, and was employed at Tinker Field as a guard; that he first met Georgia Rae Cather about three weeks prior to the last meeting: that he met her at the bus stop in front of the Log Cabins at 2400 Northwest 39th. He was asked "Did you have any particular conversation with her? A. No. She dropped her purse, or her money—her car fare—and I picked it up and gave it to her. There was just casual conversation. I had never seen her before that. I asked her where she was from, and she said she was from Pawnee."

Witness testified substantially as had George Collins concerning Georgia Rae Cather. He stated that Epley drove around the block when Georgia first got in and something was said about picking up some more girls, but she said it was kind of late and she had to go home. He also told Epley that he had to go home, so they took off. He stated that when Georgia got in the car she said to him: "Well, I know you, so I guess I will ride home." He testified to the fact that he and Collins had planned on catching the bus and going home but that after defendant saw the girls come out of the cafe that he offered to take them, the guards, home and wanted to locate the girls at the bus stop and take them home, but only Georgia was at the bus stop when they drove their car around there.

Milburn Shaffer, chief of the guards at Tinker Field, testified as to how he determined which of his men were involved in the case on trial, about taking defendant into custody, etc. This completed the state's evidence. Counsel for defendant interposed a demurrer to the state's evidence, and the same being overruled, produced a number of witnesses who testified for the defendant.

E. E. Rich testified for the defendant, stating that he lived at Enid, that he had known the defendant about five years, that they served together during World War II on the U. S. S. Bretz, and that defendant got an honorable discharge.

Dr. Joseph M. Thuringer, teacher in the Medical School of the University of Oklahoma testified. The gist of his testimony concerned the fact that some people bleed easily; facts concerning the difference in the hymen of women and the effect of sexual intercourse; the fact that in cases there would be bleeding whether the act was voluntary or involuntary; and testified to the emotional disturbance sometimes caused by difficult intercourse even between married couples. Witness admitted that involuntary intercourse would also cause emotional disturbance.

O. D. Epley, the defendent, testified that he lived at 1615 Southeast Genesee, Oklahoma City, and on June 21, 1949, worked as a guard at Tinker Field. That prior to such employment he had worked for three years in gasoline plants in Oklahoma City for the Phillips Petroleum Company, quit of his own accord, and that he served in the Navy during World War II; that he was married and lived with his wife and two daughters; that he had three sons by a former marriage; that on the night of June 21 he checked out at Tinker Field about 12:30 that night; that he gave two other guards, Collins and Cody, a ride to the city; that they each, as required, had checked in their guns before departing; that on reaching down-town Oklahoma City they parked the car in front of Wellman's Cafe on Grand avenue and went in for about ten minutes, sitting in a

booth; that he saw two girls in the Cafe but did not speak to them inside; that the girls came out of the Cafe behind them and that they talked back and forth to them; that the girls left and he and Collins and Cody got in the car and drove around north on Harvey and saw one of the girls standing at the bus stop and the other one walking north towards Main street; that they stopped and asked the girl named Georgia Cather to ride with them because the busses had stopped running; that Kenneth John Cody got out and let her in the front seat and that she sat between them; that he drove to Main and then east to Broadway and circled the block and back to Broadway and then to 23rd Street and on to North Classen and on to 39th and drove thereon west to the Log Cabin Theatre where he let Patrolman Cody out; that Patrolman Collins then got in the front seat and he continued west on 39th to May Avenue and stopped in front of a service station where Collins got out. He was asked: "Then where did you go? He answered: "Well, as Patrolman Cody got out of the car, I started to turn back east on 39th Street, because during the trip I had heard Georgia and Cody say that they only lived a couple of blocks from each other. Instead of turning back east, well—she laid her hand over on my leg and said: 'Honey, I think you are cuter than the other three, boys, let's go driving.' " Witness stated that he then drove north on May avenue; that prosecutrix had her arm around him and was telling him about living with her aunt and uncle; that when he got out by Wiley Post Airport he asked her if she would like to park and that she answered "yes"; that he pulled off on a side road and parked and that she then started loving him and they began kissing. This lasted for about ten minutes. That he then proposed that they have intercourse, and she said "all right"; that she climbed over into the back seat; that she then pulled up her dress and pulled off her panties and that he pulled off his pants; he stated that was all the clothing she pulled off. Witness denied throwing a handkerchief down out there that night or that the handkerchief said to have been found there and introduced into evidence was his handkerchief, and denied ever seeing it before. He stated that he had intercourse with the prosecutrix because she wanted to, that she did not fight, kick, protest; he denied threatening her with a gun or threatening her in any way. He stated that after the intercourse he drove the prosecutrix home, that when he got in front of her house she said, "Don't stop. This is a dead-end street. Just make a circle and come back and park on the other side of the street." That he did as requested and that when she got out of the car she came around on his side of the car where his arm was resting in the window and patted it and said, "Honey, I'll see you tonite at the same place and the same time." He stated that he then told her that he was married and had some children at home and would not be able to see her that night.

Witness stated that when he was arrested he denied to the officers that he had had intercourse with prosecutrix. He said: "I told them that I did not, because they had threatened me with the electric chair for having intercourse with a girl under 18 years of age. I was afraid. * * * Also, I did it to protect my family."

On cross-examination witness admitted that prior to leaving Tinker Field the night of the occurrence, he and the other two guards had been kidding about getting dates with girls. He admitted also that when the prosecutrix came out on the street in front of the Wellman Cafe that it was he who said to her, "Hello, Bashful." He admitted that she did not want to get in the car because she said that she going to take the bus home.

Franklin Earl Epley, father of the defendant, next testified. He just testified that he never knew of his son owning a pistol, and that witness had been

employed by the Phillips Petroleum Company for about 18 years. This completed the evidence for the defendant.

Milburn Shaffer was recalled in rebuttal by the state and he denied having threatened defendant with the electric chair for having raped a girl under 18 years of age. This completed the evidence for both the state and defendant.

Counsel for defendant filed a motion for new trial on September 24, 1949, and the same was overruled on September 27, 1949, but on February 2, 1950, a supplemental motion for new trial was filed, setting out newly discovered evidence indicating that the prosecuting witness had committed perjury at trial of defendant; that "said affidavits would convince a reasonable man that the said prosecutrix was in the habit of going out with men and carrying on in a manner such as would render her testimony in this trial highly improbable, unbelievable, and therefore sufficient to raise a reasonable doubt of the truthfulness of her testimony. * * *"

Attached was an affidavit from Pfc. Earl J. Alwood, airforce, in which he stated that he first met Georgia Cather at the Vance Airforce Base swimming pool on or about August 10, 1949; that he was with Corp. Jimmy Prines; that a week later he was introduced to her at the same pool; that she was with a married girl friend and her husband; that he next saw her at Wiebel's in Enid about 8:00 p.m., that she was waiting for Corp. Prines, that he had a cup of coffee with her; that about September 10, 1949, he drove Corp. Prines in his car to where Georgia lived in Enid and took her and Prines for a drive; that Prines had a date with her that night. He testified to other dates Prines had with Georgia, one time he was with them at about 11:30 p.m., and the police questioned them about her being parked in the street and took their names, and witness and Prines then took Georgia home. The last date he knew of Prines having with Georgia was October 12, 1949, when she told him that she would not marry him, but was returning to Oklahoma City.

The next affidavit was that of Capt. Floyd M. Kelley of the Enid Police Department. He was the officer who found Cpl. James W. Prines, the boy who was trying to marry Georgia, parked in a car with her and two of his airforce buddies at 11:30 p. m., on an Enid street. Prines stated that he and Georgia were to be married in two or three days. It was further stated: "The Cather girl was riding between Stemple and Prines in the seat and Alwood was riding in the rear compartment. As they checked out all right at this time, they were let go and they drove east and it was the last time they were seen that night."

The next affidavit was executed by George Bailey Collins, who was a State's witness at trial. It was dated January 26, 1950. He stated that on July 1, 1949, he took his car in company with Kenneth John Cody, another witness for the state, and picked up Georgia Rae Cather at the Roberts Drug Store, Oklahoma City, and drove to the Blackhawk Swimming Pool on Northeast 23rd Street, and that Cody and Georgia went in swimming from 5.30 to 7:45 and thereafter borrowed affiant's car to take Georgia home, and thereafter Cody told him that he played with Georgia's breasts and felt of her privates while in swimming.

At hearing Kenneth John Cody testified in person. He stated that he was married but had been having trouble with his wife at the time that he and Collins decided to try Georgia out to see if Epley really raped her. He stated that he was acquainted with Georgia's aunt and had 'phoned her about Georgia going in swimming with him and she let him talk with Mr. Evans, Georgia's uncle, and he gave his permission provided he would get Georgia home by 10:30. Cody stated that the uncle complained about Georgia getting in at all

hours of the night, saying that it looked like he would have to send her home, etc. Cody testified that he did not proposition Georgia to have intercourse with him but that he acted as swimming instructor and caught her by the thigh with one hand and held his other arm around her breasts.

On cross-examination he stated that he did what he did, though a married man, to try to help a "buddy in uniform, there's a matter of honor there", and that, "Yes, all police officers ' stick together." It was further developed that Epley had told witnesses about having a string of prostitutes when he lived in California, for whom he solicited or pimped. He was further asked: "You never did have your hands on her privates, did you? A. Just her breasts and her thigh." He stated that he kissed her good night.

The court, after hearing, overruled the supplemental motion for new trial.

The contention of counsel for defendant that the evidence is insufficient to support the conviction, that it failed to show resistance, and that the testimony of the prosecutrix is inconsistent, and incredible, and wholly uncorroborated, cannot be sustained.

This court has held that a prosecutrix accusing a defendant of rape by force is not required to resist to the uttermost, but only to make such resistance as she was capable of making at the time and as was reasonable for her to do to manifest her opposition, depending on all the cricumstances, such as relative strength of parties, age and condition of prosecutrix, uselessness of resistance and degree of force or threats manifested, although her resistance must be in good faith and must be real, genuine and active, and not feigned or passive or a mere pretense. Also we have held that in prosecution for first degree rape, allegedly committed on prosecutrix by force and violence and threats overcoming her resistance, evidence whether sexual act was committed voluntarily or against will of female was for jury.

See Harris v. State, 88 Okla. Cr. 413, 204 P. 2d 310, a case similar in many respects to the instant case. And see also Jackson v. State, 77 Okla. Cr. 160, 140 P. 2d 606, and Roberts v. State, 87 Okla. Cr. 93, 194 P. 2d 219, cases wherein the act of intercourse was admitted, but where the defendant claimed consent on the part of the prosecutrix.

Applying the rules set out above to the evidence heretofore recited, it is our conclusion that there is nothing in the record which causes us to believe that the evidence of the prosecutrix in this case was untrue, unbelievable, contradictory, or that she was in any way impeached. Her evidence is corroborated in many respects. We cannot say that the judgment and sentence is contrary to the law or the evidence.

The defendant admitted that at first he had falsely denied having had intercourse with the prosecutrix; when he had been told that she was under 18 years of age. He admitted the act after he found out that she was over 18, and above the age of consent. He sought to justify his action by saying that he wanted to protect his family and that the officers had threatened to send him to the electric chair. The jury no doubt pondered all these matters and did not believe defendant and did not believe him when he denied ownership of the man's handkerchief found by the officers at the scene of the act and previously described as being used by defendant to intimidate her, and after the act previously described used by defendant and then by prosecutrix in cleaning themselves, and which handkerchief was identified by her. The finding and identification of this blood stained handkerchief corroborated an important feature in the details of the attack. And while the prosecutrix testified

that defendant threatened her with a pistol, though she did not see one, she also testified that he produced a handkerchief and caused her to believe that he would choke her with it and though she threw it out of the car that he retrieved it and kept it up on the front seat and that she gave in by reason of force and fear. Of course, defendant could have had a pistol concealed in some portion of the car, for all the prosecutrix could have known. Further, the prosecutrix was barely past 18 years of age and weighed only 103 pounds. Though the age of defendant is not exactly shown, he was old enough to have been married twice and to have had five children, and old and husky enough to be a police guard. These things could be considered by the jury in pondering the question of resistance.

Counsel complains of instruction No. 3 covering the vital theory of the state, which instruction reads:

"You are instructed that rape is an act of sexual intercourse accomplished with a female not the wife of the perpetrator, where the female resists but her resistance is overcome by force and violence, or where she is prevented from resisting by threats of immediate and great bodily harm, accompanied by apparent power of execution.

"You are further instructed that rape accomplished by a male over the age of eighteen years with any female by means of force, overcoming her resistance, or by means of threats of immediate and great bodily harm accompanied by apparent power of execution preventing such resistance, is rape in the first degree.

"Rape in the first degree is punishable by death or by life imprisonment in the state penitentiary or for any term not less than fifteen years, in the discretion of the jury, and you will, if you find the defendant guilty of the crime charged against him, beyond a reasonable doubt, fix and assess his punishment therefor and definitely state same in your verdict."

The defendant excepted to every instruction given, but submitted no requested instructions. The defense, as heretofore stated, was that the prosecutrix willingly and mutually commenced a course of petting with defendant and then of her own free will had sexual relations with him. The court instructed the jury covering this theory of the case as follows (No. 6):

"You are instructed that the defendant interposes, as his defense in this action, that at the time and place alleged in the information, he accomplished an act of sexual intercourse with the complaining witness, Georgia Rae Cather, with her consent, and without her resistance; and, in this connection, the court instructs you that if you should find from the evidence in this case that said defendant did have sexual intercourse with the complaining witness, with her consent, or without her resistance, or if you have a reasonable doubt thereof, then it will be your duty to acquit the defendant."

We have carefully examined all the instructions given and conclude that the issues were fairly submitted. We do not find that the defendant was injured by any instruction given. The evidence in support of defendant's guilt is overwhelming, and this may be taken into consideration in determining whether or not the accused was injured by the instructions given. See Bowers v. State, 56 Okla. Cr. 111, 34 P. 2d 292.

The contention that the defendant was entitled to an instruction covering rape in second degree is not valid, as from the facts recited, the defendant was either guilty of rape in the first degree, or not guilty of any other degree of rape.

The affidavits attached to the supplemental motion for new trial in no way tended to prove perjury on the part of the prosecutrix. Much was hearsay. The young man she was shown to have been keeping company with at Enid was trying to persuade her to marry him.

The testimony of Kenneth John Cody brought out that prosecutrix went swimming with him soon after the alleged attack on her by his fellow guard, and she apparently knew that Cody was married, but Cody had 'phoned and gotten permission of her uncle and aunt and was on his honor. He had ulterior motives, from his own testimony, as he, under guise of acting as a swimming instructor, had felt her body, but not her privates, as claimed in one affidavit.

This case seems to be a demonstration of the lonesome, trusting, full-of-life but inexperienced country girl coming to the city only to be beset by "wolves." In the struggle for existence and the care of a large family, Georgia's parents failed to afford her that training necessary to protect her when she would be out in the world to make her way. In the small town, where no one is a stranger, she had probably gotten by with friendly quips and sociability that in the city labeled her open prey to the sex-mad characters that roam at large and everywhere prospecting for victims.

One cannot read this record without the feeling that the prosecutrix should have insisted on getting out at the first stop at the Log Cabin Theatre, which was the nearest point to her home. She was, as indicated, easy to get acquainted with, and had apparently not been adverse to a mild form of flirtation in front of the Wellman Cafe on Grand avenue. She was not wholly blameless. And while the defendant seems to have not had any moral standards and had been seeking an opportunity to commit adultery, still, there is merit in the argument of counsel for defendant, under the facts, that the punishment assessed is excessive. It is our view that justice dictates that the sentence of 40 years imprisonment be reduced to 25 years in the State Penitentiary, under authority of 21 O. S. 1941 § 1114.

As thus modified, the judgment of conviction is affirmed.

BRETT, P. J., and JONES, J., concur.