William Thomas REID, Jr., Plaintiff in
Error,

v.

The STATE of Oklahoma, Defendant in
Error.

No. A–12186.

Criminal Court of Appeals of Oklahoma.

Sept. 27, 1955.

David Tant, Oklahoma City, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Sam H. Lattimore, Asst. Atty. Gen., for defendant in error.

POWELL, Judge.

This is an appeal by William Thomas Reid, Jr., from a conviction in the district court of Oklahoma County of the crime of rape in the first degree, on Caroline Johnna Baldwin, also known as Carolyn Treisa, a girl just past 14 years of age. The defendant was 21 years old. The jury fixed the punishment at confinement in the State Penitentiary for a term of 15 years.

On appeal but two propositions are urged in brief: (1) "It is error for trial court to comment, in presence of jury, on weight of the evidence." (2) "The verdict rendered by the jury and the judgment entered by the court are contrary to the law and not sustained by the evidence."

The record contains over 400 pages of testimony. The essential problem is the application of the law to the evidence. The State does not cite an authority on the second proposition, and presents its case by way of a two-page brief. The briefs of

the parties have not been of much help. The more we have studied the voluminous record, the more complicated from a factual standpoint, has become a case that at first impression seemed simple.

We shall dispose of the first proposition at once.

Verda Treisa, mother of the prosecutrix, in answering a question to which counsel for defendant had not objected, did, as contended, testify to a conclusion. That is to say, she was asked by counsel for the State if she recalled the date of July 7, 1954. She said, "I recall it because of the tragic experience in my life." Asked what that was, she said: "That is the day that Carolyn was raped." Whereupon counsel for the defendant objected on the ground that the question was incompetent, irrelevant and immaterial, setting out the specific reason that "it calls for a conclusion of the witness." The court agreed with the objection of counsel and made some further comment to which counsel for the defendant made no objection and reserved no exception.

██ We further note that this assignment of error argued in brief was not raised in motion for new trial or in petition in error. It will not be further considered here. White v. State, 81 Okl.Cr. 399, 165 P.2d 151.

██ Considering now the next question as to whether the evidence was sufficient to sustain the verdict of rape in the first degree, or the included offense of rape in the second degree,[1] we shall, prior to reviewing the evidence, quote certain of the statutory provisions, found to be covered by Tit. 21 O.S.1951, §§ 1111, 1114, 1115 and 1116:

"§ 1111. *Rape defined.*—Rape is an act of sexual intercourse accomplished with a female, not the wife of the perpetrator, under either of the following circumstances:

"1st. Where the female is under the age of sixteen years.

\* \* \* \* \* \*

"4th. Where she resists but her resistance is overcome by force and violence.

"5th. Where she is prevented from resistance by threats of immediate and great bodily harm, accompanied by apparent power of execution. \* \* \*"

§ 1114. *Rape in first degree—Second degree.*—Rape committed by a male over eighteen years of age upon a female under the age of fourteen years, or incapable through lunacy or unsoundness of mind of giving legal consent; or accomplished with any female by means of force overcoming her resistance, or by means of threats of immediate and great bodily harm, accompanied by apparent power of execution, preventing such resistance, is rape in the first degree. In all other cases rape is of the second degree.

§ 1115. *Punishment for rape in first degree.*—Rape in the first degree is punishable by death or imprisonment in the penitentiary, not less than fifteen years, in the discretion of the jury, or in case the jury fail or refuse to fix the punishment then the same shall be pronounced by the court.

§ 1116. *Punishment for rape in second degree.*—Rape in the second degree is punishable by imprisonment in the [state] penitentiary not less than one year nor more than fifteen years."

██ This simply means, as applicable to the within case, that where the female is fourteen years of age but under eighteen years, if she consents or offers no resistance, the act of intercourse constitutes rape in the second degree.

Proceeding to a consideration of the record:

The evidence discloses that the defendant was brought up by his mother, the parents having been divorced when the defendant was quite young. His mother worked and defendant performed labor for contractors, and others, and a younger brother washed dishes in a restaurant. Defendant had an old 1937 model pick-up Ford truck that he

---

1. The trial court gave proper instructions covering rape in the first degree, as well as the included offense of rape in the second degree.

used in his work. He had finished high school. He moved with his mother to Oklahoma City when he was about 12 years of age. Defendant admitted on cross-examination that in January, 1951, he plead guilty in Arapaho, Oklahoma, to the crime of larceny of an automobile, and received a three-year suspended sentence. This evidence was admitted as bearing on defendant's credibility as a witness. He was tall, red-headed young man and weighed around 200 pounds. He was in the habit of visiting DeCoursey's Dairy Bar on Northeast Twenty-third Street, Oklahoma City, in the evenings, visiting with former school mates and talking with the "car hops".

Carolyn Johnna Baldwin was born May 20, 1940, in Tillman County. Her father died a few months after her birth and several years later her mother married Henry Treisa and moved to Oklahoma City. Carolyn remained in Tillman County at Tipton to live with her step-father's parents (the Treisas), and attended the Tipton school. She spent the summers with her mother, who was very strict about her dating boys. She wore her hair shoulder length, wore heavy rouge on her lips, and weighed 130 pounds. She and her mother gave her age as 17 when she obtained the job at DeCoursey's as a "car hop" on June 1, 1954, and Carolyn had no trouble in passing for that age. She worked until June 7, 1954.

The evidence discloses that the prosecutrix was known at DeCoursey's as Carolyn Treisa. She was so carried on the payroll. When she commenced working on June 1 she wore gray slacks and a white blouse, but for several days, including June 7, she wore the same blouse,—an aqua. It had the second button off, and the top button was left unbuttoned. One of the girls who worked with Carolyn offered her a pin, but she refused, saying that she might want someone "to see something". Her girl associates testified that Carolyn wore heavy make-up and could have passed for 21. They said that at trial she had cut her hair and dressed modestly, and looked five or six years younger, and that they hardly recognized her. They said that Carolyn was quite proud of her body, that her ambition was to be a strip-tease dancer; that

a strip-teaser known as "The Cat Girl" was her ideal; that she felt that she had as good a figure as The Cat Girl or Marilyn Monroe. One of the girls said that Carolyn fit her slacks like she had been poured in.

The evidence disclosed that on the evening of June 2, 1954, the defendant drove up to DeCoursey's in an old Ford pick-up, got out to go inside, and saw some boys standing in front talking to the prosecutrix. He had gone to school with one or two of the boys, and spoke to them; Charles Callum went in with defendant and later introduced him to prosecutrix. That he left in his pick-up but later on returned, and sat in a car with Callum and two boys by the name of Butcher, and Carolyn waited on them and then went back and talked to them.

A night or so later defendant returned to the Dairy Bar and went in and Carolyn waited on him. That her blouse was open and defendant reached over and buttoned the top button, and defendant said, "Do you want me to get you a safety pin?" And she unbuttoned the top button. The second button was gone. She acted proud of a large bosom. She was conceded by her acquaintances to be a very pretty girl. Prosecutrix cursed defendant, and also cursed Jimmie Butcher, calling him "A God-damn son-of-a-bitching bastard". She used bad language easily. The boys were in and out of the Dairy Bar, and prosecutrix, despite her apparent anger, followed them around to talk to them. Also she gave the defendant her address and telephone number, and for two mornings straight defendant telephoned Carolyn, and each time she told him that she was just getting out of bed. Defendant testified that she said, "Well, let me go get some clothes on", and that one morning she said, "I can't find anything except a bra and a pair of panties. My mother has gone next door and I can not find anything but a bra and a pair of panties." He said that he waited a little while and she came back and said, "Aw, hell, my mother is not here and I can not find them." At one time she told him that she was "standing in the raw."

Defendant testified that he asked Carolyn what she was going to do and she said that she was going to a show at the Will Rogers theatre in the afternoon. She asked defendant why he did not come over. He met her at the show, but told her that he would have to leave pretty soon as he had an appointment down town; that they held hands, and sat there a little while and that she said to him, "Don't you have something else to do?" and later said, "I wish you would leave me" and that he went across the aisle and sat down and prosecutrix went over and sat down with two or three other boys, and defendant left.

The night following the picture show date, defendant and Carolyn and the Butcher brothers were again at the Dairy Bar, and prosecutrix told them that she was going to be a "stripper" and could make Marilyn Monroe look sick, and invited them to pat her on the seat, which all of them did; that she invited them back of the Dairy Bar building, saying that she had something to show them, and each took turns at hugging and kissing her. The next morning, June 7, defendant again telephoned the prosecutrix, and as on his prior call, she told him that she did not have on any clothes and left the telephone to get her clothes, and then detailed what clothing she had found, and while she was talking was putting on her clothes and detailing the procedure. He made a date with her to take her to the show, but told her that he had to be at work at 2 P.M. She wanted to go about 12:30 or 1:00.

Adverting further to the short acquaintance between the prosecuting witness and the defendant, and further to the background, Louise Walker testified that she worked at DeCoursey's Dairy Bar from 4 to 10 in the evenings; that Carolyn, the prosecutrix, had worked there from June 1 to 7, 1954. Witness said that: "She [Carolyn] had been saying things about her body, and things like that, for quite a while, and one evening one of the boys dared another boy to offer her his ring— and he said, 'Here is my key'; and he turned around and walked off, and I turned around and looked at her and she said, 'What is the matter? Haven't you ever slept all night with a man?' And I said, 'No, I'm afraid not.'" Witness further testified: "She [Carolyn] talked about sex constantly. Every time she would say anything—about her body—'Don't you think I have sexy eyes?'; and she said she had her clothes especially made to bring out her good points."

Nelda Myers, a fellow car-hop employed with Carolyn at DeCoursey's Dairy Bar, testified:

"Q. Now, referring to Sunday, June 6, 1954, did you see her out there on that day and talk to her? A. Yes, sir; she was in the dining room— dressing room—and I went back to the dressing room to see what she was doing, and she came out, and asked me if I knew what she was doing, and I said 'No'; and she said she had been playing, and, I told her she had cars out front that needed to be waited on."

She said this was about 9:30 or 10 o'clock at night. At another time witness said that, "Well, she asked me, in the dressing room, if I didn't think she had a pretty navel, and, at that time I told her she had cars outside and I left the dressing room and shortly afterwards she came out."

Carolyn Baldwin, or Treisa, in testifying for the State, said that she first saw the defendant on the 4th day of June, 1954, at DeCoursey's; that she had a conversation with him that night, told him her name was Carolyn Treisa. He was riding in a Ford pick-up. She saw him the next day, June 5, when he drove up to DeCoursey's accompanied by a man named Jack Sussey, who was driving a Cadillac. She talked with the parties. She told about seeing the defendant at the Will Rogers Theatre the next day, about telephone calls, and said that on one occasion at DeCoursey's defendant got out of his car, pulled her back of it, and "kinda fooled with me, kinda pulled me around to the back and he forcibly kissed me twice." That was the last time she saw him until the next day, about 1 o'clock in the afternoon, at her home. That he called her up about 10 A.M. and wanted to know where she was going and wanted to know if he could see her, and she told him that she was going to her girl

friend's [next door] and if he wanted to see her, he could come over there. He came there and she told him that she was going to the show and defendant asked her if she would mind for him to come back and take her; that he and another man, a chauffeur, were in the Cadillac; that he returned in about fifteen minutes in his Ford pick-up. She told about driving to a swimming pool, which was closed, showing her an oil well near Pennsylvania Avenue where he had worked, and then parking in a clearing off that street. After that she detailed what happened as follows:

"A. Well, he pulled me over to him and kissed me once or twice; and I must have bit him on the lip, and, anyway, he got mad because he turned me over his knee and kind of spanked me; and so I pulled away from him; and so I looked, and I noticed the third button on my blouse was ripped off; and so he grabbed me again and kissed me again once real hard, and then another time, and so I tried to push away from him; and so finally I got away from him and I told him I wanted to go clean up my hair, and something that way. And so he said, 'Okey'; and so I scooted over to the door and started to open the door and the door would not open; and so he grabbed me again and started out kissing me again, and I pushed away from him somehow, and I looked down and I noticed the fourth button—the very last button on my blouse was ripped off; and so I started to button up my blouse and he grabbed me again and started out kissing me; and so finally he got his hand in underneath my blouse and unsnapped my brassiere and started out playing with my breasts; and, anyway, he pulled up my brassiere and looked at my breasts, and I screamed and started out to cry, and he told me to shut up or he would—he told me to shut up or he would knock my teeth out.

"Q. All right. What did he say? A. Well, he was holding me in his lap and so he said, 'I will take you home in a little while'. But he said, 'You keep quiet', or,—that is when he said

he would knock my teeth out; and so then he asked me if I had a bathing suit, and I said 'Yes'; and so he told me to buy me a real pretty one and I just ignored him."

She said that they then talked about religion, and what churches they belonged to, etc. She was asked:

"Q. Was he sitting under the driver's wheel all this time, Carolyn? A. Yes, he kissed me twice and I could not get my breath, and I must have caught on something because there was a little drop of blood right here on his face; and so he let me alone just for a minute until I could get my breath back, and I noticed my skirt was up above my knees and so (witness cries) and so I tried to motion towards my skirt and he looked at it and kind of laughed, and then he ran his hand underneath my skirt—(witness cries)—and put his fingers inside my pants and so I screamed and he told me to shut up or he would fix me up so nobody would ever want me again. And so I was crying and trying to get away from him, and he asked me if I wanted to get out of the car; and I did not answer him at first, and then I thought to myself I might have a chance to get away from him; and so we got out of the car and he taken hold of my arm, and I fought him, and kicked him, and tried to get away from him, and he kept a hold of my arm all of the time and I tried to get away; and he forced my legs apart—(witness cries)—and he started—(witness crying).

"Q. Where were you at that time, Carolyn? A. I was just in the car seat with my head towards the door on my side. With my head beside the door. And when I raised up I was tangled up in the door handle; and I could not get the door open; it would not come open; and then my skirt—he told me to shut up—(witness crying)

"Q. Did he hold you on the seat, Carolyn? A. Yes.

"Q. And did he insert his private parts in yours? Is that right? A. Yes.

"Q. Then what was said? What happened? A. Well, it hurt me quite a bit and I was crying and so he said for me to get out of the car and get in the back seat then; and I did not say anything, and then I said, 'Okey'; and so he got out first, and he grabbed a hold of my arm, and I kicked him, and fought him, and he pushed me up against the back of the seat. * * *" She further testified:

"A. And so he pushed me up in the back of the seat—back of the pick-up, and there was a tarpaulin, he had two tarpaulins—in the back and he reached down for one—and his grip kinda loosened on my arm, and so I was able to get away from him; and so I jumped out of the pick-up; and before I could get to my feet and start off he grabbed ahold of me and he kinda pushed and pulled me around on the other side of the pick-up and he pulled down the tarpaulin and told me to get down and I didn't get down, and so he knocked me down—pushed me down—and then he pulled up my dress and forced my legs apart, and then I was crying all this time,—and he inserted his private parts in mine—(witness crying).

\*  \*  \*  \*  \*  \*

"Q. And you got back in the car. Then what happened? A. Well, we had started back towards Pennsylvania Avenue. And he said, 'You don't have to worry about anything—you won't get pregnant'. And so I did not say anything; and he said, 'Are you going to tell your mother?' and I did not say anything at first; and then he asked me again, and I said, 'I don't know'—I said I didn't know—I really wasn't. I was scared to tell him that I was; and then he said, 'You aren't going to make something out of this, are you?' And I said, 'I don't know'. And finally he said, 'Are you going to the police about it?' And I said, 'I don't know'; and so we got back on Northwest Highway, and so he said, 'You want me to return to work tonight and see you?' and so I said, 'I don't want to see you, I hate your guts, and I don't want to see you again.' And he said, 'Oh, damn.'"

"Q. All right. What happened next? A. And so then we drove on in silence until we got within a half block of my house; then he said, 'You want me to get out and to go inside and tell your mother?' And I said, 'No'. And then when he got to my house, he said, 'Do you want me to go inside and tell your mother?' again, and I said 'No'; and I tried to get out the door on that side and I could not get it open, and so finally he opened it up for me. And then I went—"

Prosecutrix testified that on arriving back home she went to the front door, rang the bell, that nobody answered, so she went to the back door and that her mother was in the kitchen and saw her. Witness went in her bedroom and was crying and the mother went in and questioned her and the step-father went in and telephoned Dr. Cunningham and the police. In the meantime witness took a bath, put on clean clothes and her parents took her to the doctor's office where she was examined by Dr. Cunningham.

The mother, Verda Treisa, said that her daughter left the house at approximately five minutes after 1:00 and returned at 2:45; that when she returned she was crying; that her blouse buttons were torn, the collar was torn, the back of her blouse was dirty; her skirt was very wrinkled, her panties and slip were bloody; that she washed the panties and in twenty or thirty minutes they drove to Dr. Cunningham's office and then to the police station.

On cross-examination witness said that her daughter could pass for 17 years of age.

Three police officers testified to talking with defendant after his arrest. They did not warn him of his constitutional rights with reference to any statements that he might make. One officer said that defendant finally admitted having sexual intercourse with the prosecutrix but said that it was with her consent. Two other police officers said he admitted that she did not consent, but that he went ahead anyway.

John A. Cunningham, M. D., testified that on the 7th day of June, 1954, he had occasion to see Carolyn Baldwin at about 3:30 P.M. at his office; that her parents brought her; that he first made a routine examination of her body for trauma, or bruises; that he found nothing at all on the general body; that is, no bruises or evidence of trauma; that he then made a pelvic examination of her vulva and vagina, or private parts; that he found fresh blood at the inlet of the vagina and also two small tears into the hymen; that the hymen is a small membrane, skin-like membrane at the entrance to the vagina. The interior of the vagina was clean. Smears were taken which revealed no sperm germ cells present. No gonococci were present, and a Wassermann test was negative. The girl would not answer many of his questions. The doctor testified to many possible ways the injury could have happened, the effect of masturbation, etc. By reason of the absence of sperm cells the doctor could not give an opinion as to what caused the two small tears in the hymen. He thought it was some object as large or larger than three fingers.

The defendant in defense produced Charles Van Stein, a commercial photographer who identified a picture of a clearing off Pennsylvania Avenue, later identified by the defendant as the place where he parked his pick-up during the time testified to by prosecutrix; and a second picture showed the cars on Pennsylvania Avenue clearly visible as they would pass.

Ted M. Haywood, Jr., testified that he lived at 2225 Northwest Thirty-fifth Street, and had lived there for 25 years; that he employed the defendant to accept delivery of ready-mixed cement which was to be delivered at his place by the Murphy-Perkin Company at 2:30 P.M. on June 7, 1954. Witness identified the delivery ticket, defendant's "Exhibit C" from the cement mixing company, showing two yards of cement loaded at 2:01 for Ted Haywood, 2225 N. W. 35th. Witness stated that later on in the afternoon of June 7 he arrived home and helped the defendant finish laying a cement floor in one of the rooms of the garage apartment at his home. Witness further said that at about 3 P.M. of the day in question the defendant telephoned him at the ElFenix Cafe where witness was installing air conditioning, for directions as to what to do with some surplus cement.

Dewey Perkins, driver for the Murphy-Perkin Company, testified to delivering the ready-mixed cement at 2225 N.W. 35th the afternoon of June 7, 1954, at approximately 2:30 and that the cement was received by the defendant Reid.

The defendant testified about agreeing with Ted M. Haywood, Jr., to be at his place by 2:30 P.M., June 7, 1954, to receive and lay cement for him. He claimed that he had gone in the Sussey Cadillac, driven by a chauffeur, to a grocery store where the chauffeur was to get some groceries; that he purchased some cookies, etc., himself, and returned to the Treisa home in his pick-up and knocked on the door but that Carolyn came from the house next door and got in his pick-up with him. He detailed their movements thereafter substantially as Carolyn had until he parked in the clearing about 200 feet off Pennsylvania Avenue. He said he then kissed Carolyn several times and then got the tarpaulin from the truck, spread it on the ground and suggested that they get a lunch which he had theretofore purchased and consisting of cheese, crackers and cookies, out of the car. Defendant denied that he had intercourse with the prosecutrix as detailed by her. He said that he did not have much time to spend with her on account of his employment to receive and lay the cement for Mr. Haywood.

Several witnesses, associates of Carolyn at the DeCoursey Dairy Bar, and young men customers who patronized the Bar at the time defendant was there, testified concerning the acts and conduct of prosecutrix with defendant and others, several nights just prior to the alleged rape. They all testified that the aqua blouse introduced by the State and said to have been worn by the prosecutrix at the time the offense was committed, was torn and had one or two buttons missing.

Carolyn Baldwin, or Treisa, testified in rebuttal, but she only said that she was not menstruating on June 7, 1954, the last time

being the latter part of May. She also said that she had never had sexual intercourse before. She was not asked and did not deny the specific conduct of inviting the defendant and three other boys to pat her seat, or the obscene language attributed to her, or the remarks and conduct by her described by her fellow car-hops.

This completed the case.

The testimony of the prosecutrix that she had intercourse with the defendant as claimed is corroborated by all the evidence. The fact that Dr. Cunningham in an examination of prosecutrix a short time after the act alleged was unable through a microscopic examination of specimen from the vagina of prosecutrix to discern any sperm cells or traces of male semen, could be accounted for by the bath Carolyn took just prior to going to the doctor, or the defendant may have used a condom, as she stated that he told her after the act that she need have no fear of becoming pregnant.

■ Having reached the above conclusion without difficulty, we now come to the real problem presented by the record, and being whether the evidence was sufficient to support a verdict of guilty of first degree rape. Was there sufficient evidence produced by the State to show that there was real resistance in good faith to the advances of the defendant, and not a passive or feigned resistance, or pretence amounting to a sham? To constitute resistance in good faith it must have been commenced at the inception of the advances and continued until the offense was consummated. Resistance by mere words is not sufficient, but such resistance must be by acts, and must be reasonably proportionate to the strength and opportunities of the woman. If there was lack of resistance, then force would not have been used. The evidence must be evaluated in relation to these principles in order to determine if there was sufficient evidence to support the verdict of the jury. See the following cases, where the question of resistance and of force are treated: Johnson v. State, 52 Okl.Cr. 397, 5 P.2d 772; Gullatt v. State, 80 Okl.Cr. 208, 158 P.2d 353; Epley v. State, 94 Okl.Cr. 308, 235 P.2d 711; Zuniga v. State, 96 Okl.Cr. 314, 254 P.2d 378; Kidd v. State, 97 Okl. Cr. 415, 266 P.2d 992; Tit. 21 O.S.1951 § 1114.

We must interpret the testimony of the prosecutrix as to the details of her alleged ravishment with reference to her testimony of her entire relationship with the defendant and in relation to the unrefuted testimony of other witnesses as to such relationships, and the general conduct of prosecutrix, where unrefuted, as told by Louise Walker and Nelda Myers, her co-workers at the DeCoursey Dairy Bar.

■ Our task, of course, is not to weigh the evidence—that was for the jury and does not fall within the exception involved in the recent case of De Armond v. State, Okl.Cr., 285 P.2d 236. We must determine if the undisputed evidence was sufficient to support the judgment rendered. And while we must accept at face value that portion of the evidence of the two girl associates of prosecutrix, where unrefuted, still we recognize the possible motivation of jealousy as influencing part of the testimony of these witnesses. And it is our thought that possibly it is not abnormal for a girl of the age of prosecutrix, apparently an underprivileged girl, regardless of her physical development, to have a tendency to boast and pretend to her girl associates that she was far more experienced and "vampish" and popular with boys than she actually was.

Prosecutrix testified about her four days' acquaintance with the defendant and their whirlwind courtship. She said that on Sunday night, June 6, 1954, the defendant got out of his car and "kind of fooled with me and drug me around— (interrupted). Q. What did he do then? A. Well, he kinda pulled me around to the back and he forcibly kissed me twice—." This was the time that witness Callum and the Butcher brothers and the defendant testified that prosecutrix had invited them to pat her seat and that she had "necked" with each one of them, which included the defendant. But in spite of this she gave defendant a date at noon the next day. When she testified in rebuttal she did not deny defendant's testimony that at the time they made the date by telephone she told him that she

was "standing in the raw" and then detailed her dressing, telling him when she was putting on her panties, her bra, etc. And although on cross-examination following her direct examination for the State in proof of its case she had denied bragging to her co-workers Louise Walker and Nelda Myers about her body, no attempt was made on rebuttal to deny much of their testimony making her out as a sexy girl, interested in men.

In view of the testimony of prosecutrix as to defendant's violent caresses on Sunday night, June 6, would she not have known what to expect the next day when he wanted a date, and particularly when she recounted about her panties, her bra, etc., which could be expected to arouse him sexually?

There was a house within about 200 feet of the rendezvous off Pennsylvania Avenue occupied by Negroes, and there was a clear view of the avenue where motorists were continually passing. Prosecutrix said that she sat in defendant's lap. She did not detail any struggle to get away. There were no black marks or bruises on her body. She was a robust girl who weighed 130 pounds and capable of putting up formidable resistance. From defendant's conversation and conduct he had done nothing or said nothing to demonstrate that he would injure her, except that he told her once that he would knock her teeth out; but the normal language of the parties seems to have been rough. Prosecutrix, according to the testimony of other witnesses, was in the habit of using foul language, and had "cussed out" the defendant the first night they met, but moments later was back at the car talking with defendant and his friends, and even got in the car to sit with them. This was never denied by her.

Prosecutrix said that defendant assured her that she would not get pregnant. No male sperm cells were found by the doctor who examined her, indicating that defendant had time to use a condom. Defendant offered to go with prosecutrix to see her mother. She had by her own testimony asked him how long it would take when he was on the tarpaulin with her. She admitted that after defendant tried and had penetrated her in the front seat of the pick-up that she had agreed to get out of the car, but she said it was with the idea of getting away. The only offer to strike her was by pushing her down on the tarpaulin. The force was not enough to leave any marks on her person.

■ The physician testified that it would have required an object as large or larger than three fingers to produce the two small tears in the hymen of prosecutrix. From a study of medical testimony given in a great number of rape cases, we find that it is difficult to get more than one finger in a virgin, unless the hymen has been ruptured, and two fingers after rupture, so that prosecutrix may have gotten more than she contemplated as she was teasing with the defendant. But however that may be, she was not of the age of consent (18 years) and while the contention is made that defendant did not know that the prosecutrix was under the age of 16 years, such, if true, would not condone his act of having sexual relations with the prosecutrix, but such fact may be considered by the court in connection with the amount of punishment which defendant should suffer. Law v. State, 92 Okl.Cr. 444, 224 P.2d 278.

■ We are convinced that there was not sufficient evidence of resistance on the part of the prosecutrix of the advances of the defendant to sustain the conviction of rape in the first degree, but that the evidence is ample to sustain a conviction of the included offense of rape in the second degree.

■ The verdict and judgment as so modified is affirmed, with punishment fixed at ten years imprisonment in the State Penitentiary.

JONES, P. J., and BRETT, J., concur.