THE STATE OF OHIO, APPELLANT, *v.* WRIGHT, APPELLEE.

(Decided October 5, 1938.)

*Mr. Ralph J. Bartlett,* prosecuting attorney, *Mr. Henry L. Holden* and *Mr. Edmund B. Paxton,* for appellant.

*Mr. Robert E. Gibbs* and *Mr. Arvin J. Alexander,* for appellee.

GEIGER, J. This cause is in this court on appeal from the Court of Common Pleas of Franklin county.

On July 26, 1937, Opal Baxter, an unmarried female, filed a complaint charging that Harold Wright was the father of her unborn child. In due time the cause came on for trial and was heard upon the evidence presented and the charge of the court. Thereupon the jury returned a verdict of guilty. A motion for new trial was filed and also a motion for judgment notwithstanding the verdict. The motion for new trial was sustained and the motion for judgment notwithstanding the verdict was overruled. Notice of appeal was given by the state of Ohio on questions of law. A bill of exceptions is before us setting forth the evidence given on behalf of each party. The defendant did not go upon the stand. The prosecutrix gave testimony as to her relations with the defendant at or about the time of her child's conception, and stated that he was the only man with whom she had relations at or near that time. On behalf of the defendant, one witness testified to the fact that the prosecutrix had admitted her immoral relations with other men and also gave testimony as to the opportunity of such other men to have relations with the prosecutrix at the crucial period.

As is customary in such cases, the baby was exhibited to the jury and attention called to the resemblance between the baby and the reputed father. Thus far the evidence pro and con is reminiscent of the cases that each member of this court has tried while judge of the Court of Common Pleas.

A marked innovation was introduced through the testimony of Dr. Harriet H. Hyman, who testified that she was employed as a research assistant in genetics at the Ohio State University where she also taught in that branch. She has received various degrees such as M.S. and Ph.D. from the university, and has been working in blood group tests for seven years, having

also studied at the Rockefeller Institute for Medical Research in New York. She has made thousands of blood tests and is co-author of an article appearing in 2 Ohio St. L. J., 203 (1936), on the use of blood tests for disputed paternity, her associate in that article being Dr. Lawrence H. Snyder of the University Zoology Department.

She testified as to human blood group tests made to determine the presence or absence of certain substances in the red blood cells. These substances can be readily distinguished and are known as A and B and M and N. She asserted that the blood of all the people in the world, if examined, would be shown as falling into four classes, so far as these two substances are concerned. The blood may lack both substances A and B, in which case they are said to belong to group O; or the blood may contain the single substance A, thus belonging to group A; or B, thus belonging to group B; or the blood may contain both substances A and B, in which case they belong to group AB. Using substances A and B as the basis, there are four groups in the human blood, O, A, B and AB, and all people have one of these four groups. Some years ago two other substances were discovered denominated M and N. An examination of human blood throughout the world shows that people have substance M or substance N in their blood, in which case they are designated as belonging to the appropriate group; or they have both substance M and substance N, in which case they belong to group MN. Everyone in the world falls within these three groups and there are twelve possible combinations resulting from various blood groups. The blood group of a particular individual depends upon the blood group of the parents. The laws governing the inheritance of these blood groups are so exact that it can be determined by the examination of two parents of what blood group

their children will be. If the blood group of the mother be known and the blood group of her offspring, the blood group of the father can be predicted by that of the offspring. All factors come in pairs. If the blood of the child belongs to the group MN, it is known that one parent must belong to the group M and another parent belong to the group N. If the child belongs to the group M the substance must come from both parents. The tests in reference to blood examination have been extensive and accurate. If both parents belong to the M group the child can not inherit the N group.

The witness testified that she made an examination of the blood of Miss Baxter, the complainant, of Nancy Jean, the child, and Mr. Wright, the putative father. Objection was made to the introduction of this evidence, but the court held there were sufficient authorities to the effect that it is admissible and overruled the objection, to which the state excepted. The witness testified that she found Mr. Wright belonged to blood group AN and Miss Baxter belonged to the blood group AM, and that the baby belonged to the group AM, and that on the basis of such examination Mr. Wright could not possibly be the father of the child. The witness testified that the blood group MN is the basis for determining that Wright could not possibly be the father. Miss Baxter belongs to the group M, and Wright to the group N, and the baby, to the group M. Any father of the baby must have substance M in his blood because the baby gets the M substance from both parents. Wright belongs to the group N and lacks the substance M. As his blood lacks M the offspring of the combination of the blood of the prosecutrix and Wright would be MN children.

The doctor submitted to a close cross-examination, but adhered to her testimony. A motion for instructed verdict was made and overruled.

The court gave the usual charge in such cases and

especially charged in reference to the weight to be given to the testimony of the expert. The court charged rather favorably to the authority of the blood test, stating in substance that, as to the reliability of the results obtained by blood tests, the latest investigation shows that although the determination of the blood group affords no positive evidence for a declaration or finding as to who is the father of the child, it does, on the other hand, furnish evidence for the exclusion of this relationship or the determination of nonpaternity when the child's blood group does not agree in a definite scheme with that of the supposed father.

In spite of the evidence with reference to the blood test the jury found the defendant guilty.

Objection is made and here urged to the introduction of the expert testimony, and also to the direct statement of the expert witness that the man was not the father of the child on the ground that that was an ultimate fact to be determined by the jury. Whether there was error in this or error in the introduction of the evidence or in the charge of the court is of no consequence in that it was not prejudicial, for the jury in spite of such alleged errors, found in favor of the state. To be a basis of reversal the error must be prejudicial. But we find that the court did not err in this matter.

A motion for new trial was made on the ground that the verdict was against the weight of the evidence, etc., and that the court erred in overruling the defendant's motion for a directed verdict and for other errors.

The court sustained the motion for a new trial, basing it largely upon the testimony of the expert. The court stated:

"If a substance is present in the blood of the child and is absent in the blood of the mother, it is a matter

of scientific fact that said substance will be found in the blood of the father. Should the blood of the accused man lack that substance he could not possibly be the father of the child in question. On the other hand, the bloods of the mother and the putative father may be of particular combinations which could only give rise to a child of certain blood groups. Should the blood group of the child in question then not correspond to the parental combination the accused man could not possibly be the father."

The court made an entry as follows:

"It is therefore ordered, adjudged and decreed that the motion for a new trial be sustained and the motion for judgment notwithstanding the verdict be and the same is hereby overruled."

It is impossible to set out at greater length the evidence with reference to blood groupings which was admitted and upon weight of which the court set aside the verdict of the jury. We have had occasion to examine cases in which the blood tests have been permitted to go to the jury and to be the basis of judicial determination in paternity cases.

An interesting case is that of *Commonwealth* v. *Zammarelli*, 17 Pa. D. & C., 229, wherein the court said in part:

"Proof of non-paternity by this means depends on showing that, according to the laws of inheritance of determining factors, the child could not be the descendant of both the woman and the man in question. And hence, since it is assumed to be the child of the woman, it is consequently proved to be the child of a man other than the accused. The chances for a man wrongfully implicated of proving his innocence are about one in seven, or there are six chances to one that he will be unable to do so. If, however, the blood group of the man is known, it is possible to tell with greater accuracy what his chances may be of proving nonpaternity,

since the various percentages in each blood group are approximately known.''

If the tests capable of being made are so accurate, as testified to by the expert, that it is possible by the process of exclusion to protect a man who is innocent of the charge, it will be a most valuable assistance in cases of this kind. The testimony of the prosecutrix in this case is of course to the effect that the defendant was the father of her child and that there could have been no other male to occupy that undesirable posi-tion. Nevertheless evidence was introduced that the woman could and did have access to other men during the crucial period, one witness testifying that she had admitted not only to sexual relations with another man, but claimed that she was married to him.

We are of the opinion that if, as testified by the expert, this science of blood grouping has been so developed and has proved so accurate that it is not only admissible, but of very high value, the woman who has been promiscuous in her relations can no longer make her selection of the male to be charged and secure a verdict against him through the natural sympathy aroused in a jury.

The blood grouping is the fingerprint of blood, although there is a pronounced difference in that identification is made by finger prints because no two persons in the world have finger markings so nearly alike that the difference can not be detected, while in the blood test it is asserted that all living humans have blood that falls within twelve different groups. The purpose of the test is not to determine who may be the father, but who can not be the father, and is therefore to be excluded.

The assignment of errors by the state is:

(1) That the court abused its discretion in setting aside the verdict of the jury and in granting a new trial; (2) that the court erred in admitting the blood

test; and (3) that the court erred in permitting the expert witness to give her opinion upon the impossibility of the defendant being the father of the child.

As to the second and third we have already expressed our opinion. We think that it was proper to introduce the testimony under such safeguards as should always surround the testimony of an expert witness, and we are of the opinion that those were present in this case. The testimony complained of, as to the expression of the opinion by the expert to the effect that the accused could not be the father of the child, is not in our opinion such as is obnoxious to the rule.

It is urged that the court abused its discretion in granting the motion for a new trial, and that therefore this court may consider the alleged error of the court below in setting aside the verdict even though such decision is not a final order that may be reviewed on appeal.

The courts in Ohio have frequently held that an order of the court granting or overruling a motion to set aside the verdict of a jury and granting a new trial is not a final judgment or order, for the reversal of which error can be prosecuted before the final disposition of the case. The court, however, has always stated that this may be done if abuse of discretion is clearly shown. This has led attorneys to assert that there has been an abuse of discretion, in order to escape the rule that an order setting aside a verdict will not be reviewed. We think it proper to give some consideration to what may be regarded as "abuse of discretion." It has been variously stated in substance: A discretion exercised to an end or purpose not justified and clearly against reason and evidence; not merely error of judgment but perversity of will, prejudice; failure of the trial court regularly to pursue its authority, which does not include commission

of errors of law or mistake in finding of facts; not merely an error in judgment but perversity of will; a discretion exercised to an end or purpose not justified by, and clearly against, reason and evidence; a clearly erroneous conclusion and judgment against the logic and effect of facts presented; one of its essential attributes is that it must plainly appear to effect injustice; it occurs when a court exceeds the bounds of reason, all the circumstances before it being considered; it implies not merely error of judgment but error of judgment that is plain.

While the trial court's ruling is subject to review on error, the same will not be disturbed unless the abuse of discretion affirmatively appears. *S. S. Kresge Co.* v. *Trester,* 123 Ohio St., 383, 175 N. E., 611. Abuse of discretion will not be presumed, but must appear from the record. *Wyant* v. *Russell,* 109 Ohio St., 167, 142 N. E., 144; *Wagner* v. *Long,* 133 Ohio St., 41 at 49, 11 N. E. (2d), 247.

We are of the opinion that inasmuch as the law reposes in the trial judge the right to set aside the verdict which in his judgment is not sustained by the evidence or is against the weight of the evidence, his doing so is not an abuse of discretion but the exercise of his judicial function and, at most, constitutes error in judgment.

We are therefore of the opinion that under the first assignment of error, alleging that the court abused its discretion, there has been a failure to show such abuse.

Having determined that a review may not be had in this case because of an abuse of discretion, for the reason that there was no such abuse, we are confronted with the question as to whether such a review may be had by virtue of the amendment of Section 12223-2, General Code, effective August 23, 1937.

No question relating to appeal is more clearly estab-

lished than that, before the amendment, an order of a trial court granting a new trial was not a final determination of the rights of the parties and was not such an order as was reviewable by the Court of Appeals, and it is scarcely necessary to cite authorities. The cases sustaining this proposition are cited in *Wagner* v. *Long, supra,* at pages 46 and 47, to which may be added *Huff* v. *Penna. Rd. Co.,* 127 Ohio St., 94, 187 N. E., 1, the above cited case of *Wagner* v. *Long,* and *Ramsey* v. *Oyler,* 133 Ohio St., 321, 13 N. E. (2d), 577. In both *Wagner* v. *Long* and *Ramsey* v. *Oyler,* the amendment is mentioned but without comment on the point here at issue.

The amended section now under examination, with the new matter italicized, is as follows:

"An order affecting a substantial right in an action when in effect it determines the action and prevents a judgment, *or* an order affecting a substantial right made in a special proceeding, or upon a summary application in an action after judgment, *or an order vacating or setting aside a general verdict of a jury and ordering a new trial,* is a final order which may be reviewed, affirmed, modified, or reversed, with or without retrial, as provided in this title."

The definition of a final order without the new matter, as indicated by the italicizing, has been on the statute books substantially in that form for many years.

There can be no question of the purpose of this amendment. It seeks to permit reviews of the order of the court granting the new trial which had theretofore been denied for the reason that such action of the court was not a *final* order.

There is, likewise, no doubt that this is an amendment conferring a valuable right on litigants in that it permits a review of the action of the court where a verdict has been set aside after a long and expen-

sive trial, because the trial judge has misconceived
the law on matters, some of which are of small conse-
quence, occurring during the trial. The trial court
may be wrong in his action, but there was no remedy
except to retry the case, often at great expense. Many
cases occur to any practicing attorney in which the
beneficial effect of this provision is apparent. *Ramsey*
v. *Oyler, supra,* furnishes a good example of the value
of the amendment. However, we are not confronted
with that question, but must determine whether the
amendment is constitutional. Counsel in the present
case do not present this matter in their written brief
or assignment of errors, relying as they did upon the
claim that the court abused its discretion and for that.
reason they had a right to review the action of the
court, but did present the matter in oral argument.

We have two very carefully considered cases in
which two separate Courts of Appeals have held that
the amendment is unconstitutional. We shall not at-
tempt to analyze these opinions . because each so
strongly presents the view of the court rendering it
that justice could not be done the opinions by discuss-
ing the reasons which each court has given for its
decision.

The first case in point of time is *Fulton* v. *Madlener,*
57 Ohio App., 345, 14 N. E. (2d), 27, the opinion being
rendered by the Court of Appeals of Hamilton county.
The second case is that of *Basinger* v. *Yarian,* 26 Ohio
Law Abs., 647. While we will not discuss these cases
at length we will give the conclusion reached by each
court.

In the case of *Fulton* v. *Madlener,* it is held:

"It must be concluded, therefore, that the Legisla-
ture, having amplified the definition of a final order to
such an extent that it now is inconsistent with the
definition of a judgment, by including an order of the
trial court not finally determinative of the rights of

the parties, has overstepped the bounds fixed by the Constitution, as construed in *Cincinnati Polyclinic* v. *Balch, supra,* determining the jurisdiction of this court, and to such extent Section 12223-2, General Code, is unconstitutional.''

In the case of *Basinger* v. *Yarian,* the conclusion is thus stated:

''The apparent purpose of the Legislature in adopting this amendment was to make that which was not heretofore a final order such, thereby permitting the aggrieved party, without retrial, to have the acts of the trial court in granting a new trial reviewable without charging and establishing abuse of discretion on the part of the trial court in granting a new trial. * * *

''It is therefore the conclusion of this court that the amendment in question, so far as an attempt is made to make the order of the trial court in vacating or setting aside a general verdict of the jury and ordering a new trial a final order which may be reviewed, affirmed, modified, or reversed, with or without retrial, is unconstitutional.''

There are certain basic principles which must control the court in the construction of statutes, which are so well known as not to need elaboration. But among them may be stated: Courts have power to declare a statute invalid as in violation of the Constitution, but such powers should be exercised with greatest care; a statute will not be declared unconstitutional in case of doubt, but will be sustained unless clearly so; statutes should be construed liberally to avoid constitutional infirmities; a statute will be presumed to be constitutional, and it will be held unconstitutional only if in clear and irreconcilable conflict with some constitutional provision; the language of the Constitution is not to be understood as strained, technical or mysterious, but so plain that any ordinary man may understand and comprehend it. Statutes are to be given a

fair and reasonable construction in conformity to their general object and should not be given such an interpretation as would thwart that purpose.

The case of *Cincinnati Polyclinic* v. *Balch*, 92 Ohio St., 415, 111 N. E., 159, upon which the Court of Appeals of Hamilton county relies, holds that Section 6, Article IV of the Ohio Constitution, as amended September 3, 1912, confers jurisdiction upon the Court of Appeals, and the General Assembly has no power to enlarge or limit such jurisdiction. The court points out that this amended section of the Constitution does not authorize the Legislature to grant any jurisdiction but that the Constitution specifically confers on the courts appellate jurisdiction. The Legislature has authority to provide the method for perfecting an appeal but has no power to enlarge or limit the appellate jurisdiction.

One can not correctly appreciate this decision unless he reads with it the dissenting opinion of Nichols, C. J., in which he elaborates upon the words in the Constitution, "as may be provided by law." While we are controlled by the majority opinion, we can not refrain from expressing our view that there is much logic in the dissenting opinion. However, we do not feel that this case is controlling of the case at hand, as we shall attempt to point out.

We quote the following from the opinion of Judge Wanamaker in *Miami County* v. *Dayton*, 92 Ohio St., 215, 110 N. E., 726, interpreting the provisions of Section 6, Article IV, which we now have under consideration:

(Page 219). "A statute undertaking to provide a rule of practice, a course of procedure or a method of review, is in its very nature and essence a remedial statute. It should not be narrowly and technically construed but upon the contrary should receive a broad

and liberal construction to effect the purposes of its enactment.''

(Page 223). ''In construing a Constitution we apply the same general rules that we do in statutes, save and except that the terms of a Constitution must of necessity be of a more general and omnibus character, and, therefore, in order that the grants of power under the Constitution should be workable, such grants should be favorably and liberally construed so as to effect the public welfare sought by the constitutional grant.''

We conclude from these principles that it is our duty as a reviewing court to sustain the constitutionality of this provision of the statute unless it is clearly in conflict with the provision of the Constitution.

The provision of Section 6, Article IV, relating to the appellate jurisdiction of the Courts of Appeals, is as follows:

''The Courts of Appeals shall have original jurisdiction * * *, and appellate jurisdiction in the trial of chancery cases, and, to review, affirm, modify or reverse the judgments of the Courts of Common Pleas * * * within the district *as may be provided by law.*''

The Supreme Court in the well considered case of *Chandler & Taylor Co.* v. *Southern Pacific Co.,* 104 Ohio St., 188, 135 N. E., 620, held:

''Such interpretation must be given a provision of the Constitution as will promote the object of the people in adopting it, and narrow and technical definitions of particular words should be avoided. In obedience to this rule the term 'judgments' appearing in Section 6, Article IV of the Constitution as amended in 1912, is used in its broad and generally accepted meaning and not in that restricted meaning formerly given it by the Legislature in Section 11582, General Code. The term comprehends all decrees and final orders ren-

dered by a court of competent jurisdiction and which determine the rights of parties affected thereby."

It will be noted that the term "comprehends all decrees and *final* orders rendered by a court" is used; Judge Jones, on page 192, in speaking of the definition to be applied to the word "judgments," said:

"We are satisfied that in order to effectuate the purpose of those who framed this amendment, and in order to promote the object of the people in its adoption, a technical definition should be disregarded and a broad and comprehensive meaning should be adopted. We, therefore, hold that it comprehends decrees and final orders rendered by a court of competent jurisdiction and which determine the rights of parties affected thereby. Were we to arrive at any other conclusion than herein announced a review of a large number of final orders affecting the substantial rights of litigants would be denied."

It will be observed that the court and Judge Jones still adhere to the word "final." But that was the definition then under examination, and does not in our view, limit the right of the Legislature to declare what in the future shall be considered as a "final" order, and does not ·necessarily require that the new definition shall be held to violate the Constitution. In the act providing for a simplified method of appeal, Section 12223-1, General Code, provides:

"The word 'appeal' as used in this act shall be construed to mean all proceedings whereby one court reviews or retries a cause·determined by another court. * * *,"

Section 12223-2, General Code, gives the definition of a final order before the amendment now under consideration. Section 12223-3 provides, "Every *final order,* judgment or decree of a court * * * may be reviewed," etc. (Italics ours.) The latter section is the legislative determination that the word "judg-

ment,'' which alone appears in the Constitution, is broad enough to include *every final order* or decree. That definition is in consonance with the decision in the *Chandler case.* This is commented upon by Judge Jones in that case, page 192, to the effect that:

''Our bench and bar of this and preceding generations knew that the definitions of 'judgments' and 'final orders' had been engrafted upon our civil code and that our remedial procedure embraced the review of final orders; and undoubtedly those who framed the Constitution of 1912 did not contemplate a restriction of those civil remedies continuously employed for a period of more than sixty years.''

The case of *Dean et al.* v. *King,* 22 Ohio St., 118, at pages 134 and 135, at a number of points refers to the action of the court in setting aside a verdict as being a ''judgment.''

The question remains whether, if it has been conceded that a court may review only a ''final order'' of a lower court, the Legislature can in its discretion make a new definition of what is a ''final order.'' The Legislature over a period of years has not hesitated to define what is a final order and courts have constantly reviewed ''final'' orders. If it be conceded that the Legislature has the right to define a final order as it has done for years past, may it be said that it may not now make a new definition because the word ''judgment,'' in 1912 when the Constitution was adopted, had a certain meaning which did not include the order of the court in setting aside a verdict because such order was not final?

We are of the opinion that the very good purposes to be accomplished by this amendment should not be denied on what appears to us a very technical interpretation of the constitutional provisions as set out in the two cases above quoted holding the amendment unconstitutional.

We are appreciative of the fact that this matter is important to the bar of Ohio and in order that the question may be determined by the Supreme Court we will certify the constitutional conflict so as to secure a final determination by that court.

Having determined that the amendment is constitutional and that we have a right to review the act of the court in setting aside the verdict in the instant case, we come now to the consideration as to whether there was error in the court in doing this. With the view we have of the competency of the evidence as to the blood test, we are not prepared to say that the court was wrong in setting aside the verdict.

The judgment of the court below will be affirmed.

*Judgment affirmed.*

BARNES, P. J., and HORNBECK, J., concur.