ZUNIGA v. STATE.

No. A-11728.   Feb. 25, 1953.

(254 P. 2d 378.)

Wheeler & Wheeler, Tulsa, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Owen J. Watts, Asst. Atty. Gen., and Lewis J. Bicking, County Atty., Tulsa County, Tulsa, for defendant in error.

POWELL, P. J. The plaintiff in error, hereinafter referred to as defendant, was charged by information filed in the district court of Tulsa county with the crime of rape, second degree, was tried before a jury, convicted, and punishment was assessed at imprisonment in the penitentiary for a term of 14 years. Appeal has been duly perfected to this court.

For reversal, counsel set out five propositions:

"I. The court erred in refusing to grant defendant a new trial on the ground of newly discovered evidence.

"II. The verdict and sentence are not supported by the evidence.

"III. The court erred in admitting prejudicial evidence.

"IV. The court erred in admitting irrelevant testimony of police officer Glen E. Morris.

"V. That the verdict and sentence in this case is excessive under the circumstances."

Considering proposition I, the information charged that on the 31st day of March, 1951, "the defendant did unlawfully, wilfully and feloniously carnally know and have sexual intercourse with one Dolores Hernandez of the age of fourteen years."

The basic facts necessary for a consideration of proposition I, as found in the record, are that on October 20, 1951, the defendant's motion for a new trial was overruled and on the same day judgment was by the court entered sentencing him in accordance with the verdict. On February 7, 1952, at the next succeeding term of court, the defendant filed an application before the court requesting authority to take the deposition of the prosecuting witness, Dolores Hernandez, for the purpose of ascertaining the whereabouts of the child, which had been born after the trial. Defendant also sought an order of the court directing that a blood test be made of the child. Defendant stated that both he and Dolores Hernandez were of the Mexican race, and that the appearance of the child, if discovered, might show, and he had been informed that the appearance would show, it to not be of full Mexican blood and therefore he could not be the father. This statement was not supported by the affidavit of any doctor, nurse or other person purporting to have seen the child. The prosecuting witness was at the time of the trial six and a half to seven months advanced in pregnancy.

The state filed written objections to the defendant's application on the ground that the results of the blood test sought would not be competent evidence as a matter of law and would have no bearing on the real issue in the case. At this point it is well factually to note that the record fails to disclose that the defendant, prior to trial, sought a continuance of the case setting out the grounds later urged months after the trial. The effect of this failure will be treated in convenient order hereinafter. On February 16, 1952, the trial court denied the application in question. Following this, and on February 27, 1952, the defendant filed a motion for new trial based upon the grounds of newly discovered evidence.

It was alleged that at the time of the trial the child had not been born so that it was impossible for accused to offer evidence of its blood type; that the child had been born in December, 1951, after the trial; that a blood test of the mother and the baby would disclose that the defendant was not the father of the child. Attached to the motion for new trial was an affidavit of Dr. Milton L. Berg of Tulsa, to the effect that alleged parentage of the father could be excluded should he, the mother and the child have blood type determined. A chart was attached showing type to be expected in a child where parents had specified types. Neither the motion nor the affidavit enumerated any facts or set forth any newly discovered evidence. The court overruled this second motion for new trial. Did the court err?

Tit. 22 O.S. 1951 § 952, enumerating grounds for new trial, sets out in part:

"First. When the trial has been in his absence, if the charge is for a felony. * * *

"Seventh. When new evidence is discovered, material to the defendant, and which he could not with reasonable diligence have discovered before the trial, or when it can be shown that the grand jury was not drawn summoned or impaneled as provided by law, and that the facts in relation thereto were unknown to the defendant or his attorney until after the trial jury in the case was sworn and were not of record. When a motion for a new trial is made on the ground of newly discovered evidence, the defendant must produce at the hearing in support thereof affidavits of witnesses, or he may take testimony in support thereof as provided in Section 5781 [Tit 22 O.S. § 494], and if time is required by the defendant to procure such affidavits or testimony, the court may postpone the hearing of the motion for such length of time as under all the circumstances of the case may seem reasonable. The application for a new trial on the ground that the grand jury was not drawn summoned or impaneled as provided by law may be shown in like manner."

While the Attorney General sets out a number of points advanced in support of the ruling of the trial court, the important one, under the situation as presented, is the contention that "The paternity of the child is immaterial because the issue in this case is whether or not the defendant is guilty of second degree rape by virtue of having had intercourse with the prosecuting witness." The defendant was not charged with bastardy. Even though the child of the prosecutrix had been born prior to the trial, and blood tests had been made of the mother, the child and the accused, and there had been expert medical evidence that the types excluded the possibility of the defendant being the father, and had such evidence been decided admissible[1], still the defendant was charged with forcibly raping the girl who was shown to be only fourteen years of age, and even if such affair was by mutual agreement, the girl was not legally capable of giving consent. Hence the evidence that defendant would have liked to have turned out in his favor, and if so, would have liked to have presented on a new trial, could amount to nothing more than an attempt to impeach the prosecuting witness, and could not be a bar to the charge even if found true. We do not feel called upon in this case to consider the admissibility or inadmissibility of blood tests to establish or to exclude such possibility, by reason of what we have already said.

The Attorney General contends that the gist of the principles enunciated in the hereinafter cited cases by this court are to the effect that:

---

[1] This question has never been treated by this court, but has in a number of states. See State v. Damm, 62 S. D. 123, 252 N. W. 7, 104 A. L. R. 430, and opinion on rehearing, 64 S. D. 309, 266 N. W. 667; Taylor v Diamond, 241 App. Div. 702, 269 N. Y. S. 799; Beuschel v. Manowitz, 241 App. Div. 888, 272 N. Y. S. 165; Re Swahn's Will, 158 Misc. 17, 285 N. Y. S. 234; Commonwealth v. Zammarelli, 17 Pa. Dist. & Co. 229; People v. Bresloff, 173 Misc. 629, 17 N. Y. S. 2d 576; State v. Wright, 59 Ohio App. 191, 17 N. E. 2d 428.

"Before the trial court can justifiably grant a new trial on the ground of newly discovered evidence, certain elements and fundamentals must exist; that is, that if the newly discovered evidence had been introduced at the trial, there is a reasonable probability that a different result would have been reached; that the defendant must exercise due diligence; that the newly discovered evidence sought to be introduced is not cumulative or for the purpose of impeachment; that the affidavit should state a fact, not a mere conclusion; that the affidavit should set out the newly discovered evidence and not a possibility that same might be secured; and that a motion is addressed to the sound discretion of the trial court."

Cited are the following cases: Denton v. State, 58 Okla. Cr. 275, 53 P. 2d 1136; Harper v. State, 7 Okla. Cr. 581, 124 P. 1116, Beaver v. State, 54 Okla. Cr. 49, 14 P. 2d 423; Miller v. State, 40 Okla. Cr. 72, 267, P. 673; Moreland v. State, 58 Okla. Cr. 292, 52 P. 2d 97; McKissack v. State, 61 Okla. Cr. 65, 65 P. 2d 1239; Hiatt v. State, 67 Okla. Cr. 372, 94 P. 2d 262.

The cited cases in toto support the principles so urged and above quoted. Many other authorities might have been cited, such as Williams v. State, 92 Okla. Cr. 70, 220 P. 2d 836; Hathcox v. State, 94 Okla. Cr. 110, 230 P. 2d 927; Henderson v. State 94 Okla. Cr. 45, 230 P. 2d 495, 23 A.L.R. 2d 1292, certiorari denied 342 U.S. 898, 72 S. Ct. 234, 96 L. Ed 673; 23 C.J.S., Criminal Law §§ 1455-1461, pp. 1235-1256.

It is apparent that the matters now urged as newly discovered evidence could not, under the allegations set out by defendant, be so treated. Prior to trial, however, the accused could have had his blood type determined and could have made effort to have had that of the prosecutrix determined, and could have filed a motion for continuance based on the allegation that defendant had never had sexual relations with the prosecutrix and that a delay of the trial until the birth of the baby would be bound to demonstrate that he could not be the father, as she had advised the county attorney, because in view of his blood type and the blood type of the mother, the blood type of the baby would necessarily be of the type to exclude accused. Such motion would, of course, have been supported by an explanatory affidavit from a recognized medical specialist, and if the motion should have been overruled and defendant had objected to trial, based on his demand for a determination of the blood type of the expected child, and for the purpose of offsetting the expected testimony of the prosecutrix, he would have probably been entitled to have had determined the question of whether or not he was entitled to have had the blood tests made and whether the same was admissible in evidence in this jurisdiction and, as indicated, not for the purpose of proving or disproving whether or not defendant actually raped the prosecutrix but merely as strong evidence in connection with his other proof that he was not guilty of the crime charged. It is assumed that the preliminary hearing afforded him reliable information of the issues that he would have to meet.

No case from this jurisdiction as to the necessity of first bringing such matters to the attention of the court by motion for continuance has been called to our attention, and we know of no such case. In fact, the point has not been treated in the briefs before us. However, the rule stated in 23 C. J. S., Criminal Law, § 1455, p. 1240, would seem to be applicable, and being that:

"Where the accused fails to ask a continuance or postponement to enable him to produce witnesses known to him but not immediately available, he is ordinarily considered not to have exercised due diligence to produce such evidence."

By comparable reasoning, defendant's failure to have his own blood type determined prior to trial and to have sought the determination of the blood type of the mother and to have asked a postponement of the trial with a view of

having the blood type of the child determined prior to trial, and to have given the trial court opportunity to determine the admissibility or inadmissibility of such evidence prior to or at trial, precludes him from raising the issue thereafter.

While we do not find cited in C.J.S. or in the Decennial Digest a case with facts exactly as in this case, we do find that the cases do support in principle the rule stated in C.J.S., and for the reasons stated, find the rule applicable here.

By proposition II, defendant asserts that "the verdict and sentence are not supported by the evidence." This proposition will be considered and treated for convenience with propositions III, IV and V heretofore stated.

The issues raised and particularly number II, have required a most careful reading of the evidence from the record and re-consideration of that portion particularly called to our attention by counsel for defendant as well as by counsel for the State. The Attorney General suggests a succinct statement of the principles urged by defendant in the many cases cited, including the hereinafter case, by a quotation from Ferbrache v. State, 21 Okla. Cr. 256, 206 P. 617, where it is stated by this court, paragraph two of the syllabus:

"Under the laws of this state, conviction for rape may be had on the uncorroborated testimony of the prosecutrix; but when her testimony is contradictory, and the defendant testifies and denies specifically the testimony of the prosecutrix, and his testimony is corroborated, the testimony of the prosecutrix, standing alone, is not sufficient to warrant a conviction."

Delores Hernandez testified that on April 10, 1951, she became fifteen years of age; that she lived in a single family residence with her mother and father, Catherine and Raymond Hernandez, in Tulsa; that her brother was in the Navy, and her parents operated the Tampico Bar. That Gilbert (Mack) Zuniga commenced working at the bar in November, 1950; that he was about 27 or 28 years old and was married, and he and his wife lived at her home about a week or week and a half and at first both worked at the bar, then the wife quit working at the bar and moved out of the Hernandez home one day and Mack moved out the next, but Mack continued working at the bar until some time in April, when her mother fired him for getting fresh with the women.

Witness further testified that on March 31, 1951, being on a Saturday after Easter, at about 2 or 3 o'clock in the afternoon, the defendant, Zuniga, drove his car in front of their house and stopped; that she was there alone; that defendant came to the front door and inquired whether or not he had any mail there, and she told him, "Yes, just a moment and I will go in and get it." That the defendant followed her on into the house, she gave him his mail and he grabbed her hand. She was dressed in boys' blue jeans, and defendant picked her up. She testified:

"I was screaming and scratching him and biting him and doing everything I could to get away from him and I told him to go on and leave me alone. I asked him why he didn't get out here and get some of these older women instead of young girls like myself, and he said he didn't want older women; that he wanted young girls like myself."

Prosecutrix further testified that she weighed only 85 or 88 pounds at the time; that defendant carried her to a bedroom, yanked on her blue jeans and broke her belt, pulled her jeans off and undressed her and held her on the bed while he removed his trousers, and that he got on top of her and had sexual intercourse with her; that thereafter he let her go and she took her clothes to another bedroom and dressed, and he dressed and then went to the bathroom and she heard the water running; that he warned her not to tell her parents, and left.

On cross-examination the prosecutrix stated that there was no blood on the bed or her clothing as a result of the alleged intercourse; that although there was a telephone in the house she did not call her parents, the officers or anyone about the affair, and, in fact, did not mention it to anyone until about five months after the alleged rape when she told her doctor. She stated that she was afraid to tell and did not tell her mother until she had been examined by a doctor. She stated that no complaint was made to the police until in August. Prosecutrix further stated that in February, 1951, the defendant had lifted her in his arms and had taken her into the same bedroom, removed her clothing and had sexual intercourse with her, but that she did not tell her parents for fear they would do something to Zuniga and get into trouble. She stated that there was no blood as a result of that intercourse, but she cried afterwards.

The prosecutrix testified that the next time she heard from the defendant was on August 5, 1951, when he 'phoned her. She said: "I asked him if it was Mack talking, and he said 'yes'; and I asked him what did he want and he said he wanted to see me. I told him I did not want to see him at all or talk to him and he asked me if I was pregnant and I told him I was not going to tell him anything and he said I had better tell him and I asked him why, and he said because I had better tell him." She stated that five minutes later he 'phoned her again with the same conversation, but that she told him her father and mother were home, and that about five minutes later he drove up to her house and tried to get in the front door, then the back door; that Mack could not get in, and he talked to her through the front door and wanted to know if she was pregnant but that she would not tell him. She testified:

"Then he went around to the side of the window and started talking to me and he asked me if my parents were going to let me go ahead and have the baby without a father and I told him what made him think I was pregnant. He said, 'If you are, I can help you.' And I said, 'What do you mean?' and he said, 'I can either take you to a doctor or take you across the state line and marry you.' "

Prosecutrix denied telephoning her mother that Mack was at the house annoying her, or telephoning the police, but stated that her mother arrived in about five minutes and she let her in the front door and Mack apparently left, but shortly thereafter he drove his car to the corner and parked it. In the meantime the prosecutrix told her mother of the happenings and she called the police. Mack returned to the side of the house and commenced talking to her through the window again; that soon the officers arrived and they had Mack arrested.

Catherine Hernandez, mother of the prosecutrix, testified that she employed the defendant on October 25, 1950, to work in the bar operated by her husband and herself; that defendant and his wife lived at their home for a week or two between November 9 and December 2. She testified that she recalled that when Zuniga came to work on the evening of March 31, 1951, she noticed that his face and neck were scratched up, but Zuniga told her husband that he had done this shaving. She remembered that on August 5, 1951, she got off from work about 4:30 p.m., and went home on a bus, and when she got there she saw Zuniga at a side window trying to talk to someone in the house. His back was to her and he walked toward the alley as she approached her front door. She called to her daughter and she let her in and moments later Zuniga appeared at the side window begging her daughter to elope with him and promising to get a divorce and marry her.

Witness on cross-examination admitted that she had learned that her daughter was pregnant after the daughter had been examined by a doctor in July, 1951, but never learned the date the alleged intercourse with Zuniga took place

until after she had Zuniga arrested and an attorney had been consulted. Witness further testified:

"Q. At that time did she tell you she had had intercourse other than on that particular date? A. I talked to her about it, and she said 'No.' Q. She denied having had intercourse whatever other than some date in March? A. Yes. Q. Did she ever tell you that she had had intercourse with him prior to that time? A. She never did. She never has."

Witness further admitted that she had made no effort to notify the officials or prefer any charges until on August 5, 1951, when she found Zuniga at her home. From her further statements it is apparent that she did not plan on complaining, but it was brought about, as she stated:

"Well, after I caught him out there in August, I figured we had to do something about it because I could not be guarding her every minute of the day."

Witness admitted on cross-examination that her daughter did telephone her that Zuniga had called her by telephone on August 5, 1951, but did not tell her that Zuniga was coming out, but witness hung up the telephone and went on out to her home, with the arrest of Zuniga following.

Glenn E. Morris of the Tulsa police department testified to arresting the defendant at the request of Mrs. Hernandez, but stated they did not find him doing anything except talking to someone through a side window of the Hernandez home, so the officers called in to find out their authority to make the arrest. He stated that Mrs. Hernandez came out and ran at defendant brandishing a paring knife.

Jim Gott testified to being a police officer and that he removed defendant from his cell on August 6, and inquired of him as to whether or not he cared to make a statement, and defendant said he did not, but did want to see his attorney. The officer then offered sympathetic remarks to the effect that many of such cases were not rape cases at all. That defendant answered, "I don't know. I think her mother just wants me to marry her." That defendant said the mother had been calling him and chasing him. The officer testified that he asked the defendant, "Do you believe this baby is yours?" and he answered, "I don't know." The implication by such answer was of course that it could be. Defense counsel objected strenuously to the statements of the officers on the ground that the defendant had not been previouly advised of his constitutional rights. More will be said on this point at the conclusion of a summary of the defendant's testimony.

The defendant testified in his own behalf and denied that he had intercourse with Dolores Hernandez in February, 1951, or on March 31, 1951, as charged, or that he had ever at any time had sexual relations with her. He testified to having a wife and a step-daughter three years of age, and that he had lived in Tulsa about 22 years, and had served in the Marine Corps one year and in the Army two years; that he and his wife went to work at the Tampico Bar, 20 East First Street, Tulsa, in October, 1950; that soon Mrs. Hernandez suggested that they move to her home, which they did. That Mrs. Hernandez assigned his wife to work on the shift with Mr. Hernandez, and he worked with Mrs. Hernandez, and would take her home at 2:00 a.m. each night. That friction developed between defendant and his wife over this, and when Mrs. Hernandez assigned his wife to work on Sundays and let him off on that day, his wife quit the job and moved out of the Hernandez home to the Carlton Hotel, which was over the Tampico Bar. That his wife sued him for divorce and Mrs. Hernandez urged him to facilitate the divorce by signing papers, and sent him to her attorney and he did sign papers and Mrs. Hernandez told him she would pay the expenses. Witness stated that within three days he made up with his wife, and he moved from the Hernandez home to the Carlton Hotel with her.

The defendant further testified that he went to the Hernandez home only two times after moving out. That on February 17, 1951, Mrs. Hernandez told him draft classification card had been sent to her home and he went out to get it the same day. It was received in evidence and bore postmark February 16, 1951. He denied getting the card March 31, 1951. He stated that when he registered he was living at the Hernandez home, and this accounted for the card being sent there; and that he received no other mail at that address.

Witness stated that Mrs. Hernandez was very jealous of his wife, who was young and good looking and received tips from the men who were always trying to make passes; that after he and his wife made up, Mr. and Mrs. Hernandez came to their apartment one time. Defendant testified:

"Q. On the occasion of your living at the Carlton Hotel did Mr. and Mrs. Hernandez come to your room or apartment at any time? A. Yes. Q. When did they come up there, if you know? A. It was in the morning but I don't know what day it was. It was in the morning. Q. Were you and your wife present? A. Yes, sir, both of us. Q. Did you and your wife have any conversation with Mr. and Mrs. Hernandez? A. Yes. All four of us were in the room. Q. What was the conversation? A. She told my wife, she said, 'Wilma, my husband thinks that Mack and I have been sleeping together.' Q. Up to that time, Mack, had you been taking her home every night? A. Yes, sir. Q. In your car? A. Yes, sir. Q. That was a part of your job to take her home every night? A. Yes, sir. Q. And she came up and told that in front of your wife? A. Yes. She said, 'I don't believe he has anything to do with her.' She told Raymond that and then they left and she left me the next day. Q. She left you the next day? A. Yes, sir. Q. And you separated? A. Yes, sir."

Defendant testified that on August 5, 1951, Dolores Hernandez 'phoned his grandmother, and told her that she wanted to talk with him but he was not there at the time; that when he returned his grandmother gave him a number and he called, and Dolores answered the 'phone. Witness stated:

"She said her mother was going to get me in trouble, and I said, 'What about? I knew she was mad at me but what is she going to get me in trouble about?' And she said, 'Come out here and I will tell you about it'." He stated that when he got there she told him she was pregnant and her mother was going to get him into trouble about it, and he asked her, "Why me?" and "She said, 'That is what she has done, she is going to blame you for it.'"

On cross-examination defendant was positive that he called Dolores but one time. He denied that he tried to get in the house; that Dolores asked him to come to the house and talk through the window. He stated that his car was in the alley and he got in it to go but saw Mrs. Hernandez and again parked his car, but at the front, and again talked to Dolores through the window. He stated that he never asked Dolores at any time if she was pregnant, but she told him that she was. He denied telling Officer Gott that he planned to marry the girl, or in any way indicated that he might be the father of the child.

Thus the case closed. The jury found the defendant guilty. This is not an easy case. From the medical evidence of specialists to be found in a long line of cases decided by this court it is clear that the prosecutrix was not telling the truth when she stated that she had never had intercourse with any other person than defendant when at the same time she stated that inspite of this the sheets and bedding where the act supposedly took place were not stained and apparently the alleged act caused her no pain. She was fourteen years of age, and weighed 85 to 88 pounds, while Zuniga was a married man 27 years of age. She was not humiliated or shocked enough to telephone her parents or the officers, or tell anyone until nearly four months later and her mother did not know she was pregnant until she had visited a physician. The mother talked to the daughter about the matter a day later. But then the mother did not call the officers and apparently did

not try to get in touch with the officers. The mother admitted that the daughter had denied any previous intercourse with defendant, except March 31, 1951, but the prosecutrix when testifying told of a former affair of the same pattern as the last and not causing her to disclose the matter to anyone.

The mother, according to the defendant, caused his wife to leave him by reason of the self-accusation of an affair between herself and Zuniga. There was ample opportunity by reason of Zuniga working with her until 2:00 o'clock each morning and driving her home. What could have been her motive, if she made such statement? If true, this was unusual conduct.

But here the fact remains that by reason of the age of the prosecutrix, if there was intimacy, the fact that it may have been by mutual consent does not matter. Tit. 21 O. S. 1951 §§ 1111, 1114, 1116.

The testimony of the defendant by reason of the facts mentioned does not rise to that degree of certainty as to leave one reading the evidence free of doubt. But it is a certainty that she had intercourse with someone, and defendant had opportunity on March 31, 1951, and according to the testimony of prosecutrix did rape her; and according to the accused he had opportunity on March 17, 1951, but did not rape prosecutrix at that or any other time.

The evidence by reason of the bad feeling between Zuniga's wife and Mrs. Hernandez, and by reason of the association of defendant and Mrs. Hernandez at the Tampico Bar, weakens the corroborative statements of Mrs. Hernandez. She did not call the officers for a month after learning of her daughter's condition, and it was nearly seven months from the time of the first alleged act until the daughter mentioned the matter. We must note that though the defendant testified, he did not offer any corroborative testimony of matters that might have had an important bearing on the case in the eyes of the jurors where verified. We cannot say that the testimony of the prosecutrix was contradictory as to the specific act charged. She was a little girl of the Mexican race, in the Ninth grade in school and apparently of average intelligence; still does the record justify the conclusion that the contradictions as to a number of minor matters overcome her positive testimony as to what occurred in her home between her and the defendant on two occasions so as to absolve defendant from the charge of statutory rape? The state's case was weak in the respect pointed out, and it is true, as argued, that defendant may have been convicted by reason of the implications in the statement of Officer Jim Gott where he testified that he asked defendant, "Do you think it is your baby?" and he purportedly answered: "I don't know." Counsel strongly urge that the defendant's constitutional rights were violated in the questioning by reason of the admission by the officer that he did not advise the accused of his right not to make a statement, and that anything he might say might be used against him. However, the officer testified that he did tell accused that he did not have to make a statement if he did not want to, and he did tell the jailer the name of the lawyer the accused wanted to see.

We conclude from a careful study of the testimony of the officer that although the accused stated he did not want to make a statement, and the officer did not prepare one for defendant's signature, the conversation testified to was an apparently voluntary one. See Coleman v. State, 70 Okla. Cr. 246, 104 P. 2d 1004, 105 P. 2d 431; Williams v. State, 65 Okla. Cr. 336, 86 P. 2d 1015; and Rowan v. State, 57 Okla. Cr. 345, 49 P. 2d 791, 792. In the last mentioned case, in the fifth paragraph of the syllabus, we said:

"The fact that the defendant was under arrest and in jail, and was not warned that any statement made by him might be used against him, will not

affect the admissibility of any voluntary statement made by him, which would otherwise be competent."

We have given consideration to the cases cited by the defendant as applicable to this case. Among the cases cited are Davidson v. State, 57 Okla. Cr. 188, 46 P. 2d 572, 573; Witt v. State, 29 Okla. Cr. 357, 233 P. 788; Howard v. State, 79 Okla. Cr. 247, 153 P. 2d 831; Alcorn v. State, 70 Okla. Cr. 386, 106 P. 2d 838; McLaurin v. State, 34 Okla. Cr. 324, 246 P. 669. We have also considered Louis. v. State, 92 Okla. Cr. 156, 222 P. 2d 160; Epley v. State, 94 Okla. Cr. 308, 235 P. 2d 711, and Beasley v. State, 94 Okla. Cr. 353, 236, P. 2d 263. We think that in the within case there was sufficient evidence to submit the question of defendant's guilt to the jury.

We believe, however, by reason of the facts heretofore recited, that justice would best be served by reducing the sentence of fourteen years assessed against the defendant, to a term of five years in the State Penitentiary, and, as so modified, the judgment is affirmed.

JONES and BRETT, JJ., concur.