Commonwealth v. Nathanic

*William P. Kelly*, Assistant District Attorney, and *Donald J. Perry*, Special Prosecutor, for Commonwealth.

*H. Clifton McWilliams, Jr.*, for defendant.

MCDONALD, J., October 5, 1957.—Defendant having been found guilty on a charge of fornication and bastardy, filed motions for arrest of judgment and for a new trial. His motion for arrest of judgment contends the evidence was not sufficient to sustain the verdict of the jury. The motion for new trial states the following reasons: (1) The verdict is contrary to the evidence; (2) the verdict is contrary to the weight of the evidence; (3) the trial judge erred in excluding the following question, "in a period of six months prior to this time had you had intercourse with anyone else."

Helen Martin, the mother of the child, testified to an act of intercourse with defendant on February 25, 1956, at which time she said a child was conceived. Thereafter, "a couple of days before Easter," she advised him she was pregnant and he was the father of the child. The child, a female, full time and weighing seven pounds at birth, was born on November 25, 1956. The charge of fornication and bastardy was filed on December 20, 1956. The mother of the child denied intercourse with any man other than defendant, a month before, or a month after, the conception on February 25th. Defendant denied having intercourse with the mother of the child on February 25, or at any time.

Dr. Ralph Greene, chief pathologist at the Conemaugh Valley Memorial Hospital, Johnstown, testified he had made blood tests on defendant, Helen Martin, and the baby. He testified the blood type of defendant was AB, that of Helen Martin was A, and that of the baby was O. In his words, he concluded, "there is no possibility that Anthony Nathanic (defendant) could be the father of this child in question".

He further stated that his determination of nonpaternity is based on Mendel's Law and the results of the tests are a "biological fact". The tests were made by the chief technologist, Miss Barnyak, under the supervision and observation of Dr. Greene. With regard to the possibility of error he stated:

"Well, we checked it three times. It would be impossible. Checked with controls, positive and negative controls . . . This test was checked and double checked and triple checked, as it always is when a matter of exclusion is done. It is done by different people to see if their results compare, and it is then, it is done simultaneously with a known different blood of the same group to make sure the results jibe, and then it is done with one that does not have this factor to see that everything is working. That is what we call controls."

Under the Act of June 15, 1951, P. L. 585, 19 PS §871, where a verdict has been rendered against defendant in a criminal prosecution, he may move for arrest of judgment for the reason the evidence is insufficient to sustain the charge, and if the court so decides it shall discharge the defendant and dismiss the case. Whether or not the evidence is sufficient to sustain the charge must be decided on the Commonwealth case: Commonwealth v. Wright, 383 Pa. 532; Commonwealth v. Smalansky, 64 Dauph. 310.

In reviewing the Commonwealth case, we are of the opinion the evidence was sufficient to establish a prima facie case and put defendant to a defense. Thus, the motion in arrest of judgment must be dismissed.

In his motion for a new trial, defendant contends the trial judge erred in excluding a question asked Helen Martin as to whether she had intercourse with anyone other than defendant within a period of six months prior to the alleged date of conception. Since there was testimony the child was a full-time, nine-month baby, the Commonwealth objected to the ques-

tion because it went beyond the normal period of gestation. She was then asked whether she had intercourse with anyone other than defendant one month before February 25, 1956, the alleged date of conception, or one month after that date. This question she answered in the negative.

We recognize the materiality of inquiries as to sexual connection with others than defendant at or about the time the child is begotten, or within the normal period of gestation. However, interrogation as to incidents of sexual intercourse within a period of 15 months before the birth of the child (six months prior to the alleged conception), would in the light of medical experience, serve no purpose other than possibly to attack the character of the mother. While she testified the child was full time, there was no medical testimony on this. We realize each case must be decided on its own record. However, the Superior Court in Commonwealth v. Jodlowsky, 163 Pa. Superior Ct. 284, on the basis of medical testimony, recognized that a period of gestation for a normal nine-months child might vary from 260 to 340 days. The question asked in this case exceeds the maximum in the aforesaid case by nearly four months. The mother of the child having denied intercourse with anyone other than defendant within the normal period of gestation, we think there was no prejudice in sustaining an objection to the question. Thus, this reason for a new trial must be dismissed.

Defendant's motion for a new trial because the verdict was against the evidence and the weight of the evidence raises a question of the evidential value of blood grouping tests. In fornication and bastardy cases, when the verdict is against defendant, should a new trial be granted when uncontradicted evidence of blood grouping tests excludes him as father of the child?

The scientific aspect of blood tests is explained in "Disputed Paternity Proceedings", Schatkin, 3rd ed., pages 164-68. In summary, we find that all human blood is classified into four groups and three types, as follows:

| Blood Groups | Blood Types |
|---|---|
| A | M |
| B | N |
| AB | MN |
| O | |

The blood groups were first classified by Dr. Karl Landsteiner in 1901. In the first three groups he discovered that the red blood cells contain genes (or agglutinogens) referred to by the letters A and B. The fourth group referred to as O, contained neither gene A nor B. The human blood is composed of two main parts. The red cells which give the blood its color and a fluid called the plasma or serum. It is in the red cells that the genes appear. The serum of the blood contains two substances called agglutinins a and b. When a serum containing agglutinin a is mixed with red blood cells containing the gene A, the red blood cells are clumped together (agglutinated), or entirely destroyed. Thus, it may be ascertained that the blood of the individual tested must belong to group A or AB. On the other hand, the serum containing agglutinin a will not affect red blood cells which belong to group O or B. Thus, these two groups can be ascertained. Similarly, agglutinin b acts on the blood of group B and AB, but not on group O or A. The conclusion from these tests, therefore, is that an individual with group A blood cannot have agglutinin a in his serum. Otherwise the clumping or complete destruction of the red blood cells occur with fatal results. By the same token, a group B individual cannot possess agglutinin b in his serum. Thus the blood of any individual can be classi-

fied as a group. In 1927, two additional genes, M and N, were discovered in the human red blood cells. These are entirely independent of the agglutinins a and b. Sera for testing persons with M, N or MN genes, is obtained by injecting human blood into rabbits or other animals. Tests are conducted similarly with this serum to determine the type.

On the basis of experimentation, the firmly established laws of inheritance are as follows:

1. The agglutinogens A and B cannot appear in the blood of a child unless present in the blood of one or both parents.

2. A parent belonging to group AB cannot give rise to a group O child and a group O parent cannot give rise to a group AB child.

3. Agglutinogens M and N cannot appear in the blood of a child unless present in the blood of one or both parents.

4. A type M parent cannot give rise to a type N child and a type N parent cannot have a type M child.

Thus medical science has established that blood types are handed down from parents to offspring in accordance with the Mendelian Law of inheritance. No gene can appear in a child which was not present in at least one of its parents. Consequently, a given pair of parents can only produce children whose blood falls within certain well defined groups. Thus, it is possible not only to identify the group and type of blood of any given individual, but also to exclude paternity (or maternity) in certain instances. In its practical application to this case, it may readily be seen that no person in the AB group can have an offspring with blood belonging to group O.

Here, defendant had AB blood and the mother of the child A. Therefore, under the Landsteiner-Bernstein theory, defendant could not have been the father of the child if the tests were properly made. This con-

clusion is supported by an abundance of authoritative scientific textbooks and writings such as Gradwohl Legal Medicine (1954), page 544, wherein it is stated "an AB individual cannot be the parent of an O child", and in Legal Medicine Pathology and Toxicology, 2nd ed. (1954), page 662, it is stated: "The most important laws which govern inheritance of groups O, A, B, and AB are: . . . 2. An O parent cannot have an AB child and an AB parent cannot have an O child (Bernstein)."

While we shall later discuss the weight given this type of evidence in other States, we note with interest, a comment by Schatkin in "Disputed Paternity Proceedings", page 208:

"Dr. David Harley in his book, Medico-Legal Blood Group Determination, published in London in 1943, says that the number of blood tests carried out up to then in the continental European courts is in the tens of thousands. What convinced the European courts of the utter infallibility of the test was the fact that the thousands of exclusions obtained were almost invariably followed by the mother's belated confessions, and prosecutions and convictions for perjury. The courts of Europe today regard a blood test exclusion of paternity as unanswerable and indisputable proof of non-paternity, and blood tests are compulsory and routine in every affiliation case commenced."

Thus, the infallibility of the tests is not only universally accepted by the men of science, but enjoys wide-spread acceptance by courts in other countries. An exclusion of paternity is accorded by the courts of those countries, that probative weight which it rightfully should have in view of the scientific certainty of the theory.

Act of Assembly, May 24, 1951, P. L. 402, 28 PS §306, provides as follows:

"In any proceeding to establish paternity, the court on motion of the defendant, shall order the mother, her child and the defendant to submit to one or more blood grouping tests by a duly qualified physician to determine whether or not the defendant can be excluded as being the father of the child, and the results of such tests may be received in evidence but only in cases where definite exclusion of the defendant is established."

In view of the universal acceptance of blood tests as a "biological fact" based on the law of genetics, it would seem the court should, if satisfied of the accuracy of the tests, direct a verdict for defendant on a bastardy issue. Thus, in effect, such evidence would be conclusive of nonpaternity. However, the Act of 1951 relates only to the admissibility of the evidence and not to its conclusiveness. This was recognized in Commonwealth v. Hunscik, 182 Pa. Superior Ct. 639, where the court categorically stated that blood grouping tests are not conclusive. Thus, a trial judge finds himself securely impaled on the horns of a dilemma. On the one side he is faced with an immutable scientific fact that defendant is not the father of the child, and on the other side, he must submit the issue to the jury in view of the wording of the Act of 1951 and the Hunscik decision. Several States, notably Michigan, California, New Hampshire and Oregon, have solved this dilemma by adopting the Uniform Act On Blood Tests to Determine Paternity, recommended in 1952 by the National Conference of Commissioners on Uniform State Laws. Under the provisions of this act, the experts are called by the court as witnesses with the right of the parties to demand other independent tests; if the court finds the conclusions of the experts, as disclosed by the evidence based on the tests, precludes paternity, the question is then resolved by the court. If the ex-

perts disagree in their findings or conclusions, the question is then submitted to the jury upon all the evidence. In other States having statutes similar to the Act of 1951, the courts have held the tests are conclusive if shown to have been properly conducted and there is no evidence they have not been properly conducted. These States are Maine (Jordon v. Mace, 144 Me. 351, 69 A. 2d 670); New York (Saks v. Saks, 189 Misc. 667, 71 N. Y. S. 2d 797; Clark v. Rysedorph, 281 App. Div. 121, 118 N. Y. S. 2d 103; Scalone v. Scalone, 199 Misc. 210, 98 N. Y. S. 2d 167); Vermont (Pomainville v. Bicknell, 118 Vt. 328, 109 A. 2d 342).

In several States, namely Ohio, Louisiana and New Jersey, the courts have taken the view that tests which indicate nonpaternity are not conclusive, but merely entitled to the same evidentiary weight as other evidence. However, in Ohio (State v. Wright, 59 Ohio App. 191, 17 N. E. 2d 428), a bastardy proceeding, a new trial was granted on the basis of blood grouping tests excluding defendant as the father of the child. Thus, in the United States, the majority rule holds that results of the tests are conclusive, whereas the minority holds they are entitled to the same evidentiary weight as other evidence.

Since the results of tests excluding paternity in Pennsylvania are not conclusive on the bastardy issue (Commonwealth v. Hunscik, supra) or the fornication issue (Commonwealth v. Wright, 383 Pa. 532), and we cannot, therefore, direct a verdict or grant a motion for arrest of judgment (Commonwealth v. Wright, supra), may we grant a new trial?

As a general rule a verdict rendered contrary to, or in disregard of, evidence which was not improbable or inconsistent and not contradicted nor discredited, will be set aside and a new trial granted: CJS, New Trial, vol. 66, sec. 70(a), page 222. This rule is aptly

expressed in Pennsylvania in Elia v. Olszewski, 368 Pa. 578 (579), as follows:

". . . the trial judge should not permit a capricious verdict to stand against uncontradicted testimony of credible witnesses whose veracity there is no apparent reason to doubt, unless such testimony is in itself inherently incredible or contradictory."

We recognize, of course, that a jury need not accept uncontradicted testimony as true. Without intending in any way to abrogate this time-proven right of the jury, we may say the prerogative to do so in view of the limitation of the general rule above, may not be lightly indulged or exercised because of passion, prejudice or sympathy.

In criminal cases where the jury must be satisfied beyond a reasonable doubt of defendant's guilt, it should consider most carefully, evidence which would naturally raise a reasonable doubt and under no circumstances should it reject such evidence capriciously, or arbitrarily.

In this case, Dr. Greene, chief pathologist of the Conemaugh Valley Memorial Hospital, vastly experienced in the field of immuno-hematology, testified positively that the blood tests excluded paternity. He explained the procedure of blood tests, the various controls used to prevent error, and the underlying genetic law. There is not one scintilla of evidence in contradiction, either of the infallibility of the results, or the accuracy of the testing procedure. Thus, the jury had for its consideration on the issue, uncontradicted testimony from a reputable source, not improbable nor inherently incredible. If such testimony is reviewed dispassionately and justly as the jury was bound to do, it could lead to no other conclusion than reasonable doubt of guilt. In view of the verdict, we must conclude that the testimony was either rejected, or inadvertently overlooked, by the jury.

Medical science has perfected the tests to a scientific certainty. However, because the use of blood tests in Pennsylvania paternity proceedings is comparatively new, there is some reluctance on the part of courts and the legislature to accord it the probative value it rightfully should have. Nevertheless, to permit a jury merely on the basis of countervailing testimony as to the facts of intercourse by the mother of the child, to return a verdict of guilty, thereby flagrantly disregarding the results of blood tests which are accepted by medical science and many courts as a fact of life and nature founded on an immutable law of genetics, would cause a great miscarriage of justice against which, under the present state of statutory and case law in Pennsylvania, the court can only relieve by granting a new trial.

We do not overlook the possibility of error in blood testing procedure. However, the jury may not conjecture that error was made without some basis in the evidence. Here, there was no testimony of error either as to the procedure or the conclusion of the report. To permit this verdict to stand merely because the jury may reject the testimony, when such rejection was obviously without regard to the facts, would be to compound the injustice. On the other hand, in justice to the child and mother, there should be full opportunity to challenge the qualifications of the expert, the procedure and the correctness of the report. We realize, while the law of genetics may be infallible, those performing the tests are subject to human error. Therefore, in this case, if opportunity was not afforded the Commonwealth because of the limited time before trial to examine into the possibility of error or the qualifications of the expert, then a new trial will permit this.

In concluding that a new trial must be granted, we are impressed by the report of the National Conference

of Commissioners on Uniform State Laws which was made after exhaustive study of the subject of blood tests: Uniform Laws Annotated, 9 Misc. Acts 1955, Pocket Parts, page 13:

"As to the makeup of the blood, the testing process is reasonably simple. It is practically the same thing in which the eleven million or more men were tested in determining blood types in the service. It is the same kind of test made of the blood of donors to the Red Cross and Hospital Blood Banks. Consequently, this is one of a few classes of cases in which judgment of Court may be absolutely right by use of science. In this kind of a situation it seems intolerable for a Court to permit an opposite result to be reached when the judgment may scientifically be one of complete accuracy. For a Court to permit the establishment of paternity in cases where it is scientifically impossible to arrive at that result would seem to be a great travesty on justice."

Therefore, impressed with the infallibility of the results of blood grouping tests excluding paternity when properly made and the firm conviction that the jury in this case, either arbitrarily and capriciously disregarded, or inadvertently overlooked, the value of this evidence and failed to give it that weight which in the opinion of this court would have naturally raised a reasonable doubt as to the guilt of defendant, we believe it necessary, to avoid an injustice, that a new trial be granted.

We, therefore, make the following

*Order*

Now, October 5, 1957, upon consideration of the record and arguments of counsel, defendant's motion for arrest of judgment is overruled and his motion for a new trial is granted.